874 A.2d 919

**CONSUMER PROTECTION DIVISION**

v.

John MORGAN, Michael Almony and Lee M. Shpritz, et al.

No. 4, Sept. Term, 2004.

Court of Appeals of Maryland.

May 13, 2005.

Vernon Scott Bailey, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, and William D. Gruhn, Asst. Atty. Gen., Baltimore), on brief, for appellant/cross-appellee.

J. Michael Conroy (Pasternak & Fidis, P.C., Bethesda), on brief; John A. Bourgeois (Andrew Jay Graham of Kramon & Graham, P.A., Baltimore), on brief; Gerald M. Richman (Gerald M. Richman, P.A.; C. William Michaels, Baltimore), on brief, for appellees/cross-appellants.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

This case began as an enforcement action brought by appellant, Consumer Protection Division of the Office of the Maryland Attorney General ("Division"), under the Maryland Consumer Protection Act, Md.Code (1975, 2000 Repl.Vol., 2004

Cum.Supp.), §§ 13–101 through 13–501 of the Commercial Law Article.[1] The Division charged a property-investor, a mortgage lender, and two appraisers with using unfair and deceptive practices to take advantage of unsophisticated, first-time home buyers in Baltimore City.[2] The action concerns forty-eight properties in the Bel Air/Edison area sold in 1998 and 1999. The Administrative Law Judge ("ALJ") issued a Proposed Order, and, following a hearing on exceptions, the Division issued a Final Order.

Appellees Lee M. Shpritz, L & R Properties, Inc., West Star Properties, Inc., West Star Company, LLC, Michael Almony, Almony Appraisal Services, LLC, and John M. Morgan, Jr., filed an action for judicial review in the Circuit Court for Baltimore County. The Circuit Court affirmed in part and reversed in part, remanding the matter to the agency. The Circuit Court ordered the three cases against Shpritz, Morgan, and Almony, respectively, consolidated and its opinion considered as governing all three cases.

---

1. Unless otherwise indicated, all future references are to the Consumer Protection Act, Md.Code (1975, 2000 Repl.Vol., 2004 Cum.Supp.), §§ 13–101 through 13–501 of the Commercial Law Article.

2. The Consumer Protection Division is a division of the Office of the Attorney General with a mandate to protect and promote the welfare of consumers. *See* § 13–201; § 13–204. As such, it is entrusted with broad powers to enforce and interpret the Consumer Protection Act. *See id.* The Attorney General is a constitutional officer, *see* Maryland Constitution, Art. V, whose duties include prosecuting and defending cases on behalf of the State. *See Consumer Protection v. Consumer Publ.,* 304 Md. 731, 501 A.2d 48 (1985). The powers of the Division include the following:

 "The statutory powers of the Division include the power to receive and investigate consumer complaints, initiate its own investigation of any possibly unfair and deceptive trade practice, issue cease and desist orders, adopt rules and regulations which further define unfair or deceptive trade practices or otherwise effectuate the purposes of the Act, and seek a temporary or permanent injunction in a civil enforcement proceeding. §§ 13–204 and 13–403(c)(2). The statute further provides that the Division may '[e]xercise and perform any other function, power and duty appropriate to protect and promote the welfare of consumers.' § 13–204(11)."
 *Id.* at 745, 501 A.2d at 55.

The Consumer Protection Division appealed to the Court of Special Appeals, and Morgan cross-appealed. We issued a writ of certiorari on our own initiative before that court considered the issues. 380 Md. 617, 846 A.2d 401 (2004).

## I.

### A. Federal Housing Administration–Insured Mortgages

At its core, this case is about a property seller's efforts to procure Federal Housing Administration ("FHA") insured mortgages for his customers, two appraisers' appraisals of property values, and a lender's approval of the mortgages. We begin with a description of FHA loans and the process for their approval.

The Federal Housing Administration of the Department of Housing and Urban Development's ("HUD") Office of Housing provides mortgage insurance on loans made by FHA-approved lenders. The insurance protects lenders against losses from homeowner defaults. As a result, FHA-insured mortgages require significantly smaller cash investments by the mortgagor to close a loan. The cost of the insurance is passed to the homeowner, enabling the program to be self-sustaining. U.S. Dep't of Hous. and Urban Dev., *The Federal Housing Administration, at* http://www.hud.gov /offices/hsg/fhahist ory.cfm (last modified May 10, 2004).

The FHA requires, with a few exceptions, that all FHA-insured single family mortgages originate through its Direct Endorsement program. 24 C.F.R. § 203.5(b) (2004). Under the program, an approved lender serves in the FHA's place to review an application and determine whether the proposed mortgage is eligible for FHA insurance. *Id.* at § 203.5(a). To be approved as a Direct Endorsement lender, the lender must have five years of experience in the origination of single family mortgages, employ an underwriter authorized to bind the lender, and submit initial mortgages for review. *Id.* at § 203.3.

A Direct Endorsement lender is bound to exercise the same level of care it would exercise for mortgages not insured by the FHA. *Id.* at § 203.5(c). HUD publishes a handbook delineating the minimum standards of care for Direct Endorsement lenders. *Id.; see* U.S. Dep't of Hous. and Urban Dev., No. 4000.4, *Single Family Direct Endorsement* (1994) [hereinafter "No. 4000.4"]. Specifically, the lender is instructed to evaluate the mortgagor's "credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction." 24 C.F.R. § 203.5(d) (2004). A seller who is an employee of the lender cannot be involved in processing the mortgage application. No. 4000.4 at 1–14.

The lender plays an important role in ensuring that the purchaser will be able to pay the mortgage. Lenders look to the purchaser's credit history, income, stability of income, and other factors to determine the purchaser's capacity to repay the mortgage. 24 C.F.R. § 203.33 (2004); 24 C.F.R. § 203.34 (2004); U.S. Dep't of Hous. and Urban Dev., No. 4155.1, *Mortgage Credit Analysis for Mortgage Insurance, One to Four Family Properties* 2–3, 2–6 (2003) [hereinafter "No. 4155.1"]. The FHA requires the purchaser to pay at least three percent of the purchase price before the mortgage is insured. 24 C.F.R. § 203.19 (2004). The lender is responsible for ensuring that the purchaser makes this payment. No. 4155.1 at 2–10. If a permissible donor, such as a relative or close friend, gives funds to the purchaser for the closing costs, the lender must document the transfer. Such documentation includes a gift letter, providing details about the gift and the donor. *Id.*

FHA regulations also require that lenders prevent a seller from making large payments to a purchaser that would enable the purchaser to pay closing costs and prior debts, while hiding the purchaser's inability to pay the mortgage. The seller may contribute up to six percent of the sales price towards closing costs and other expenses, but any contribution above six percent is deducted from the sales price in determin-

ing the mortgage. *Id.* at 1–7. The seller may not funnel money to the purchaser by giving money to a "donor" to transfer to the purchaser. *Id.* at 2–10.

A crucial element of the endorsement process is the appraisal. The Direct Endorsement lender must have the property appraised to determine the maximum mortgage permitted for that property. U.S. Dep't of Hous. and Urban Dev., No. 4150.1, *Valuation Analysis for Home Mortgage Insurance* 1–1 (1990) [hereinafter "No. 4150.1"]; *see* 24 C.F.R. § 203.5(e) (2004); 24 C.F.R. § 203.18 (2004). The appraiser is required to complete a Uniform Residential Appraisal Report (URAR), which is the standard form used in the appraisal industry. No. 4150.1 at 8–1. Before completing this report, the appraiser must make a thorough personal inspection of the subject property and all comparable properties referenced in his or her report, inspecting the exterior and interior of the subject property. *Id.* at 8–2. After completing the appraisal, the appraiser sends one copy to the lender and one to the HUD Field Office. No. 4000.4 at 3–3. The underwriter then reviews the appraisal and can seek clarifications and further information from the appraiser. *Id.* The seller or another party must sign an agreement to deliver a written statement of the appraised value of the property to the purchaser before the sale. 24 C.F.R. § 203.15 (2004). The purchaser signs a "Statement of Appraised Value" form acknowledging that the lender disclosed the appraised value and alerting the purchaser that he or she may elect to cancel or renegotiate the sales contract if the underwriter determines the property value to be lower than the sale price. U.S. Dep't of Hous. and Urban Dev., Form HUD–91322.3, *Statement of Appraised Value for a Mortgage to be Insured Under the National Housing Act* (2003) [hereinafter "HUD–91322.3"]. While the lender hires and pays the appraiser, the lender may charge the mortgagor for the appraiser fees. *Id.* at § 203.27(a)(3)(v).

An FHA-qualified appraiser must adhere to an extensive set of standards. HUD publishes an Appraiser Handbook: U.S. Dep't of Hous. and Urban Dev., No. 4150.2, *Valuation Analysis for Single Family One- to Four–Unit Dwellings* (1999)

[hereinafter "No. 4150.2"]. An FHA-qualified appraiser is required to obtain, read, and comply with this handbook and to comply with any other HUD instruction and standard. 24 C.F.R. § 200.206 (2004). In addition, an appraiser must conform to the *Uniform Standards of Professional Appraisal Practice,* issued by the Appraisal Standards Board. U.S. Dep't of Hous. and Urban Dev., Mortgagee Letter 96-26 (1996). The appraiser's reports must contain sufficient documentation of all information reported so that the underwriter can assess the appraiser's logic, reasoning, judgment, and analysis. *Id.*

The FHA requires that an appraiser employ the sales comparison appraisal method when evaluating one or two family houses. No. 4150.1 at 6-1. Utilizing this approach, the appraiser searches for comparable properties ("comparables") sold within the previous year and uses the sale prices of those properties to ascertain the value of the subject property. Under No. 4150.1, comparable sales should not be over six months old, because older sales might reflect a different market. If the appraiser does select comparables over six months old, the appraiser should explain why he or she did not choose more recent sales. No. 4150.1 at 9-2; *see also* No. 4150.2 at 4-6 (directing that comparable sales "should not exceed six months" and "must not exceed twelve months"). The method for selecting comparables is "bracketing." No. 4150.1 at 8-3. Bracketing involves narrowing the range of values for the subject property. An appraiser brackets by establishing a value range for the neighborhood where the property is located and then selecting comparables of slightly higher and lower value to the subject value. *Id.* at 2-18. The aim is to select comparables that are as similar to the subject property as possible; appraisers are instructed by the FHA to "[a]lways select the comparables with the fewest dissimilarities." *Id.* at 8-3. If there is a difference in the properties that affects value, such as location, view, quality of construction, or age, the appraiser must make an adjustment in the appraised value of the comparable to account for the difference. *Id.* at 8-3. To complete the Uniform Residential

Appraisal Report, the appraiser must provide detailed information about the comparables. For example, the appraiser must note the proximity of the comparable to the subject property. If the comparable is more than a mile away, the appraiser must explain why such a distant comparable was selected. *Id.*

The Uniform Residential Appraisal Report also requires an appraiser to indicate whether the subject or comparable properties were sold during the previous year. The *Uniform Standards of Professional Appraisal Practice's* Standard Rules require broad disclosure. *See* Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice* (2005), *available at* http://209.213.21 7.34/html/USPAP200 5/toc.htm. Under Standard Rule 1–5(a) and (b), an appraiser must analyze any current sale agreement, option, or listing and any prior sales occurring in the year before the appraisal. Appraisal Standards Board, *Advisory Opinion AO–1* (1990), *available at* http://209.21 3.217.34/html/ USPAP 2005/ao1.htm.[3] Standard Rule 2–2 calls for the written appraisal report to include a commentary on the appraiser's efforts to obtain this information. *Id.* Detailed information is important, because quick resales of the subject property could alert the appraiser and lender to the possibility of an artificially inflated sales price, especially when the original purchaser sells the property at a significant profit. Similarly, prior sales of a comparable could raise concerns that the comparable was sold at an artificially inflated price or that the prior sale was not an arms length transaction. As such, prior sales of a comparable could alert the appraiser of the comparable's unsuitability for assessing the subject property's value.[4]

---

**3.** Subsequent to the appraisals in the instant case, Standard Rule 1.5(b) of the *Uniform Standards of Professional Appraisal Practice* was amended to require that the appraiser analyze any prior sales of the subject property occurring within the three previous years. *See* Appraisal Standards Board, *Uniform Standards of Professional Appraisal Practice* (2005), *available at* http://209.213.217.3 4/html/USPAP2005/to c.htm.

**4.** At the time of the transactions in this case, no federal regulation prevented the approval of FHA mortgages when the subject property

## B. Resources for Appraisers in Baltimore

The appraisers and experts on appraising in this case primarily employed two types of listing services. First, all the appraisers relied upon the same property data bases. Before 1997, the data base used in Baltimore was the Greater Baltimore Board of Realtors' Multiple Listing Service ("MLS"), also called Crabnet. Beginning in 1996, MLS began integrating into a new regional data base system, the Metropolitan Regional Information Systems ("MRIS"). As part of the transition from MLS to MRIS, the two systems experienced significant problems, including discrepancies between the two data bases and high lag times between when a sale or other event occurred and when it was available in the data base. By the beginning of 1998, these problems had been resolved and only MRIS was available as a source of current data.[5]

---

had been sold within a year of the current sale. A new regulation added after the transactions in this case, and thus not applicable to this case, imposes much stricter requirements on the seller. Single Family Mortgage, 68 Fed.Reg. 23375 (May 1, 2003), added 24 C.F.R. § 203.37a. The new section mandates that the mortgaged property be purchased from the owner of record and requires the lender to obtain documentation verifying that the seller is the owner of record. 24 C.F.R. § 203.37a(a) (2004). The regulation states that a property's eligibility for an FHA-insured mortgage is "dependent" on the time between the seller's acquiring the property and the current sale. Id. at § 203.37a(b). The section prohibits sellers who purchased the property 90 days or less prior to the resale from qualifying the property for an FHA mortgage. Id. When the resale is within a 180 day period, the section requires submission of additional documentation verifying the time between the sales and supporting any increase in sale price greater than 100 percent. Id. Additionally, the section stipulates that HUD may require additional documentation for any resale within a year, if the resale is at least five percent more than the original sale. Id.

5. MRIS contains data for properties throughout Washington, DC, most of Maryland, and parts of West Virginia, Pennsylvania, and Virginia. Data in MRIS come from a variety of sources, including real estate agents and tax records. MRIS contains information on active homes for sale, homes previously listed for sale, homes withdrawn from the market, and sold homes. Appraisers can search MRIS's data bases for comparable sales by setting parameters, such as date, neighborhood boundaries, street, zip code, or property age.

Appraisers predominantly use MRIS to access two sources of information: listings and public records. Listing sheets for each property

The appraisers also used deed reporting services. The two deed reporting services employed by appraisers in this case were SpecPrint and LUSK (also known as Experian). These services compile information on deeds from local courthouses and send the information to appraisers on a periodic basis, typically monthly. There is a lag time of approximately ninety days between when deeds are recorded and when the information is sent out by the deed services.

## II.

Pursuant to § 13–403(a),[6] the Division filed a Statement of Charges against Lee M. Shpritz, L & R Properties, Inc., West Star Properties, Inc., West Star Company, LLC ("Shpritz" or "Shpritz parties"),[7] American Skycorp, Inc., Lee P. Woody, III, John D. Hall,[8] John M. Morgan, Jr., Michael Almony, and

---

are completed by real estate agents and provide a sales history, including when the property was listed for sale, how may times the sale price was updated, and whether the price was lowered. Listings also often contain details about the property, such as the number, size and location of bedrooms, number of bathrooms, garage space, lot size, and whether kitchens and bathrooms have been updated. Appraisers also utilize MRIS to access public records. Using this search, appraisers can find the tax records for the property, providing information such as the owner of record, property size, legal description, and tax assessment. The records also list prior transfers, including the date, price, grantor, and grantee.

**6.** Section 13–403(a) authorizes the Division to "hold a public hearing to determine if a violation of this title has occurred," mandates that the Division serve "a statement of charges on the alleged violator," and delineates the hearing's procedures.

**7.** L & R Properties, Inc., West Star Properties, Inc., and West Star Company, LLC, did not participate in the administrative hearings. Shpritz participated and represented himself, but he did not represent his companies. Before the Circuit Court and this Court, Shpritz and his companies all participated and were represented by the same counsel. Unless otherwise indicated, when we refer to "Shpritz," we refer to Shpritz and his companies.

**8.** Hall settled with the Division during the course of the administrative hearings. American Skycorp and Woody did not participate in the administrative hearings or any subsequent proceedings, including this appeal.

Almony Appraisal Services, LLC ("Almony"), alleging participation in an illegal "flipping scheme" against first-time home buyers with poor credit histories. The Division alleged that (1) a "flipper" purchased properties and sold the properties quickly at artificially inflated prices; (2) appraisers filed deceptive appraisals to facilitate federally-backed mortgages sufficient to purchase the homes at the artificially inflated prices; and (3) a lender extended mortgage loans to the buyers and ensured that the mortgages were insured by the Federal Housing Administration. According to the Division, each party to the scheme benefited: the flipper made a profit on the property, the appraisers earned more appraisal assignments from the lender, and the lender made increased profits through higher mortgages without incurring any risk.

The Division alleged that the defendants' actions constituted "unfair or deceptive trade practices" under § 13-301(1), (3), and (6). This section provides, in pertinent part, as follows:

"Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

. . . .

(3) Failure to state a material fact if the failure deceives or tends to deceive;

. . . .

(6) False or misleading representation of fact which concerns:

(i) The reason for or the existence or amount of a price reduction; or

(ii) A price in comparison to a price of a competitor or to one's own price at a past or future time . . . ."

Section 13-303 prohibits such practices:

"A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:

(1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;

(2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;

(3) The extension of consumer credit; or

(4) The collection of consumer debts."

## A. The Parties

From August 20, 2001 through September 20, 2001, Administrative Law Judge ("ALJ") Sondra L. Spencer conducted eighteen days of administrative hearings. Our discussion of the parties is derived from ALJ Spencer's Proposed Findings of Facts: [9]

### 1. Consumer Protection Division

 Section 13–201 establishes the Division of Consumer Protection in the Office of the Attorney General, charging the Division with the duty to administer the Consumer Protection Act.[10] The Division has the power and the duty to receive and investigate complaints and to initiate an investigation of any unfair and deceptive trade practice. § 13–204.[11] At the hearing before the ALJ, the Division, acting in its prosecutorial role, presented as witnesses seventeen consumers, a Division investigator, an expert appraiser, an expert in FHA Direct Endorsement loans, one former American Skycorp employee, one Shpritz employee, and one community leader.

---

9. As only the appraisers challenge the factual allegations in this appeal, our statement of the facts will refer to the other parties' activities as facts, rather than allegations.

10. Section 13–201 provides as follows:
"There is a Division of Consumer Protection in the Office of Attorney General. The Division shall administer this subtitle."

11. Section 13–204 in part grants the Division the power and duty to:
"(1) Receive and investigate complaints from any person affected by any potential or actual violation of this title;
"(2) Initiate its own investigation of any unfair and deceptive trade practice...."

## 2. Sellers

Lee M. Shpritz is a licensed real estate salesperson, who buys and sells residential real estate. He is the sole owner of L & R Properties, Inc., West Star Properties, Inc., and West Star Company, LLC, all of which have their principal place of business at the same address in Baltimore. L & R Properties, Inc., is a marketing and sales company. West Star Properties, Inc., and West Star Company, LLC, are holding companies used by Shpritz to buy and sell residential real estate. The Shpritz parties purchased property, made certain repairs, and then quickly sold the properties. In some instances, resale occurred before the Shpritz parties settled on the property.

Shpritz violated the Consumer Protection Act by falsifying the buyers' applications for FHA-insured mortgages to fund their purchases at artificially inflated prices. Shpritz targeted first-time home buyers with past and present credit problems and little or no savings through advertisements on cable television and coupons mailed in cable television bills and published in newspapers. The typical coupon advertisement contained pictures of two moneybags, listings of properties and monthly payments, and the following statements:

"**This COUPON is worth $1,000 towards the purchase of one of the following houses.**

"**Only $1,000 required to buy these houses.**

"**FHA AND VA FINANCING**

\* \* \*

"**Don't let slow, bad, or no credit stop you from !!!calling!!!**

"**L & R Properties Inc. SPECIALIZES in the FIRST TIME !HOMEBUYER!**"

When individuals responded to an advertisement, Shpritz and his companies took advantage of their lack of education and desire to own a home by: (1) instructing them to sign fully or partially blank documents and falsely asserting that this was standard practice and that the documents would be

completed accurately; (2) listing on loan applications personal property the consumers actually did not own, misstating on the applications the consumers' debt and the amount paid as deposits, and increasing or changing the purchase price, all without the consumers' knowledge; (3) in six transactions, selling the property for more than the price posted in Shpritz's office and only informing the buyers at the settlement; (4) advertising and accepting the $1,000 coupons, but not deducting that amount from the sale; (5) falsely telling consumers that the homes had been inspected; (6) failing to disclose to consumers that he was a loan officer for the mortgage lender, American Skycorp; and (7) in six transactions, acting as both loan officer and seller.

Deceiving the purchasers was not sufficient for Shpritz to succeed in his scheme to sell the houses at artificially inflated prices; he also had to ensure that consumers with few assets and poor credit histories would obtain mortgages backed by the FHA at the artificially inflated prices. Shpritz misled the FHA by: (1) misstating on applications the purchasers' debts and assets; (2) advising consumers on how to falsify gift letters to indicate that relatives or friends, rather than Shpritz, had contributed funds for closing; and (3) leaving blank the space on the Maryland Residential Property Disclosure and Disclaimer Statement for disclosing how long Shpritz had owned the property. Additionally, Shpritz recruited Reverend Christina Holtsclaw of the East Baltimore Deliverance Center, a Baltimore City church, to sign gift letters attesting to providing funds to purchasers. In fact, Shpritz provided the gift funds, not the Church. In return for this service, Shpritz agreed to contribute $200 to the Church's building fund per gift letter.[12] Shpritz's employee, Robert Stagmer, arranged for the Church's Community Initiatives, Inc. to offer counseling to purchasers and provide them certificates of

---

12. L & R Properties, Inc. issued a $14,400 check to the Church on July 28, 1998. Shpritz contributed $7,900 to the Church between September and October 1998. In 1999, HUD authorized approved non-profit organizations to provide funds to purchasers. The East Baltimore Deliverance Center was not an approved organization.

completion. In some instances, the Community Initiatives, Inc. would issue certificates to purchasers of Shpritz's properties, even though the purchasers did not attend the counseling sessions. The certificates were shown to the lender to support the loan applications. As a result of this deception, many of the consumers purchased houses they could not afford and defaulted on their mortgages.

### 3. Lenders

American Skycorp, Inc. is a residential mortgage lender founded and owned principally by Lee P. Woody III. John D. Hall is the minority owner, owning five percent of the company. American Skycorp was licensed as a mortgage lender by the Maryland Commissioner of Financial Regulation and was an FHA Direct Endorsement lender.

The Company was the lender for each property in this case and was aware of Shpritz's conduct. Shpritz brought the loan applications to Woody, who assigned them to loan officers. In some transactions, Woody acted as the loan officer. In others, with Woody's knowledge, Shpritz signed as the loan officer for properties, responsible for certifying the seller's information, even though he was the seller. In some cases, Woody overrode the underwriter's objections to and conditions for the loan approvals.

American Skycorp abused its authority and violated federal guidelines by: (1) failing to reconcile appraisal report information, including the differences between the owners listed on the appraisals and on the titles; (2) approving loans when borrowers had unacceptable credit histories, including defaults, garnishments, unpaid judgments, negative payment histories, and collection accounts; and (3) failing to reduce sale prices when Shpritz provided gift funds or contributed more than six percent to the buyer's closing costs. Through these abuses, American Skycorp approved federal mortgages inappropriately, thereby enabling Shpritz to sell the properties at artificially inflated costs.

As a result of American Skycorp's improprieties, HUD informed the Company in September 1999 that its early default claim rate was 236% higher than the average rate of other comparable lenders in Baltimore. By November 2000, one of American Skycorp's three Maryland offices had surrendered its mortgage lending license, the Maryland Commissioner of Financial Regulation had issued a cease and desist order against the office, and HUD had withdrawn its approval of American Skycorp's Direct Endorsement status and imposed a $220,000 civil penalty against it.

### 4. Appraisers

Appellee and Cross–Appellant John P. Morgan, Jr., is a real estate appraiser. He had been approved by the FHA to appraise properties for FHA-insured loans. He regularly performed appraisals for American Skycorp, including thirty-two of the properties in this case. In May 2001, the FHA removed him from its list of approved appraisers based upon one of the appraisals involved in this case.

Appellee Michael Almony is a real estate appraiser and the sole shareholder of Appellee Almony Appraisal Services, Inc.[13] Almony was approved by the FHA to appraise properties with loans that would be insured by the FHA. Almony had performed appraisals for American Skycorp since 1998. He appraised two properties involved in this case, 4106 Harris Avenue and 4230 Seidel Avenue. In December 2000, the FHA removed him from its list of approved appraisers for one year based upon Almony's appraisal of 4106 Harris Avenue.

The Division and the appraisers present conflicting versions about the role of the appraisers in this case. The Division depicts the appraisers as crucial players in the flipping scheme, deceiving the FHA and the purchasers by artificially inflating the values of the homes and hiding the fact that

---

**13.** Almony Appraisal Services, Inc. was founded in 1995 by Michael Almony and his brother. Almony's brother left the company in 1999, was not the appraiser for the two properties involved in this case, and is not a party in this case.

Shpritz recently had purchased the properties he was selling. The appraisers view the Division's charges against them as a baseless maneuver to strengthen its case against the other parties by presenting a picture of a coherent scheme.

The Division relied primarily upon the reports and testimony of Robert Hinton to support its allegations against the appraisers. Hinton, who was received by ALJ Spencer as an expert in the field of appraising property, reviewed the appraisals by Morgan and Almony at issue in this case. For each property, he conducted either a field review or a desk review. In each review, Hinton inspected the exterior of the subject and comparable properties, while in field reviews, Hinton also inspected the interior of the subject property.[14]

The Division alleged that the appraisers inflated the values of the properties, enabling Shpritz to sell the properties at artificially inflated prices and burdening consumers with high mortgages. The Division accused the appraisers of three types of misrepresentations in their completion of the Uniform Residential Appraisal Report for the properties: (1) inaccurately representing that the appraised properties had not been sold in the preceding year; (2) choosing unrepresentative properties as comparable sales; and (3) inflating the predominant values of properties in the neighborhood.

In their testimony, Morgan and Almony each generally denied any misrepresentations. In response to Hinton's reports and testimony, they presented appraising as an art, not a science, and claimed that any discrepancies between their appraisals and Hinton's reports were based on the inevitable differences between any two professionals' appraisals of a property. Morgan and Almony conceded that they might have performed less than "A" work on a given appraisal, but asserted that they did not make any misrepresentations.

---

14. In inspecting the exterior of the subject and comparable properties, Hinton's "desk reviews" were more extensive than a typical desk review. *See* U.S. Dep't of Hous. and Urban Dev., No. 4150.1, *Valuation Analysis for Home Mortgage Insurance* 9–1, 9–2 (1990) [hereinafter "No. 4150.1"] (detailing requirements for a desk review).

## B. The Administrative Proceedings

The Administrative Law Judge conducted hearings and issued a Proposed Decision, concluding that Shpritz and his companies had violated § 13–301(1), (3), and (6) and that American Skycorp and Woody had violated § 13–301(1) and (3). She determined that Morgan did not violate § 13–301(1) and (3) in regard to the comparable sales and neighborhood predominant values, but that he did violate those sections by failing to report accurately past sale histories. She concluded that Almony had not violated the Consumer Protection Act.

The Consumer Protection Division, Shpritz, and Morgan filed exceptions to the ALJ's proposed findings. Consumer Protection Division Chief William Leibovici held a hearing on the exceptions. He also reviewed all the documentary evidence and transcripts of five witnesses' testimony.[15] Chief Leibovici reversed the ALJ's conclusions that the Division had not proven that Morgan and Almony had made misleading statements about comparable sales and neighborhood predominant values and that Almony had made misleading statements about prior sales.

The Division issued a Final Order, concluding that each respondent had violated the Consumer Protection Act. The Division issued a Cease and Desist Order [16] and required each to pay restitution, civil penalties,[17] and costs of the administrative proceedings. The civil penalties amounted to $1,000 per transaction; Shpritz, L & R Properties, Inc., and West Star Properties, Inc. each were ordered to pay $46,000, American

---

**15.** For reasons not evident from the record, transcripts of other witnesses' testimony were not available at the time.

**16.** Under § 13–204(4), the Division may "issue a cease and desist order with respect to any practice found by the Division to be an unfair or deceptive trade practice." *See* § 13–403 (setting forth the procedure to be followed for the issuance of a cease and desist order).

**17.** Section 13–410(a) provides that a first time violator "is subject to a fine of not more than $1,000 for each violation." Section 13–410(c) states that the State may recover these fines in "an administrative cease and desist action under § 13–403(a) and (b) of this subtitle."

Skycorp and Woody each were ordered to pay $45,000, Morgan $34,000,[18] and Almony $2,000.

In its Final Order, the Division ordered restitution against all the appellees. The Division determined the restitution owed for each property sale, calculating restitution for each of the forty-eight properties, and held each violator involved in a given transaction jointly and severally liable. The Division calculated restitution as the sum of the seller's, lender's, and appraiser's monetary benefits from the transactions. According to the Order, the seller's benefit equaled the buyer's purchase price minus the seller's initial acquisition cost. The lender's benefit equaled the fee paid to the lender minus the appraisal fee paid to the appraiser. The appraiser's benefit equaled the appraisal fee received. These calculations resulted in the following totals:

| | |
|---|---|
| Shpritz: | $2,272,801.50 |
| L & R Properties, Inc.: | $2,272,801.50 |
| West Star Properties, Inc.: | $2,272,801.50 |
| American Skycorp: | $2,209,359.00 |
| Woody: | $2,209,359.00 |
| Morgan: | $1,556,574.00 |
| Almony: | $ 75,669.50 |

The Division postponed allocation determinations to each victim until the violators paid the restitution; a person other than the individual purchaser might receive part of the restitution. Finally, the Order provided for restitution to any other consumers subject to the violators' unfair or deceptive trade practices and detailed a procedure for such additional claims, including an administrative fact-finding hearing.

Shpritz, Morgan, and Almony filed a petition for judicial review in the Circuit Court for Baltimore County. Shpritz challenged the Division's order of restitution as to those purchasers who did not testify at the administrative hearing. Shpritz noted that he was ordered to pay restitution for forty-six transactions, but that individual purchasers testified re-

---

18. The Division has conceded that Morgan's civil penalties should be $32,000, rather than $34,000, as Morgan appraised thirty-two of the properties.

garding only sixteen.[19] The Circuit Court agreed and struck the restitution calculations for the thirty-two individuals who did not testify, stating that while "the Division is correct in saying that reliance is inherent in the process of purchasing, processing the loan and relying on others, that does not mean there is any reliance for the 32 cases where extractions without testimony were used to provide evidence."

Shpritz argued that the Division's restitution calculations inflated the gains from his misdeeds. In calculating restitution, the Division did not deduct any of Shpritz's expenses, other than his original purchase of the properties. These payments amounted to significant sums; according to the Division's findings, Shpritz's payments through gift letters or payments of the purchasers' delinquent credit accounts often exceeded six percent of the property's sale price. The Circuit Court ruled that the Division erred by not reducing the restitution by the amount Shpritz contributed to the transactions through phony gift letters and other payments. The Circuit Court reasoned as follows:

> "Restitution is what 'they' lost. If 'they' did not lose a certain sum because it was furnished to them from outside (payments of debts, gifts for the downpayment, then they did not lose it and somehow this has to fit into the restitution formula)."

Shpritz appealed the Division's Order as to joint and several liability. The Circuit Court agreed with him and reversed, holding that the Division may not hold violators of the Consumer Protection Act jointly and severally liable. The Circuit Court reasoned that the Consumer Protection Act does not mention joint and several liability and that such liability is not consistent with restitution, whose purpose is to disgorge unlawfully obtained benefits from violators.

Shpritz, Morgan, and Almony appealed the ALJ's denial of their request for a jury trial. The Circuit Court affirmed,

---

19. Of the forty-eight transactions, Shpritz was ordered to pay restitution in forty-six, Morgan in thirty-two, and Almony in two.

reasoning that the Division sought restitution, restitution is an equitable remedy, and there is no jury trial right for equitable remedies.

Morgan appealed the Division's role as investigator, prosecutor, and adjudicator, arguing that this combination of functions denied him his constitutional right to due process. The Circuit Court affirmed.

Morgan and Almony appealed the Division's reversal of the ALJ's proposed findings about the comparable sales and neighborhood predominant values. The Circuit Court reversed and remanded. The Circuit Court agreed with the Division that the ALJ had erred as a matter of law in concluding that the appraisal process was too subjective for her to formulate a conclusion about the selection of comparable sales and the calculation of neighborhood predominant values. According to the Circuit Court, however, the Division should have remanded the matter to the ALJ to assess the competing evidence. The Division could not have determined based solely on the "paper recitations," *i.e.* the transcripts and exhibits, whether the appraisers had violated the Act. The Circuit Court concluded that such a judgment required a demeanor-based credibility assessment of the competing witnesses and that the ALJ, not the Division Chief, must perform that role.

Morgan appealed the Division's determination that he had violated § 13–301(1) and (3) based on misrepresentations of prior sales histories, comparable sales, and neighborhood predominant values. The Circuit Court held that the Division's findings as to prior sales histories were supported by substantial evidence but reversed as to neighborhood predominant values and comparable sales.

Morgan appealed the Division's imposition of civil penalties against him. The Circuit Court affirmed.

Almony appealed the Division's reversal of the ALJ's proposed findings that his failure to note a prior sale for one of the properties was neither false nor misleading. The Circuit Court reversed the Division's holding, reasoning that the

ALJ's finding was a demeanor-based credibility judgment and that there was no evidence to indicate that Almony's inaction constituted misrepresentation, rather than negligence.[20]

### III.

The Division noted a timely appeal to the Court of Special Appeals. Morgan cross-appealed. Before the Court of Special Appeals considered the issues, we granted certiorari on our own initiative. 380 Md. 617, 846 A.2d 401 (2004). Before this Court, the Division and Morgan raise the following issues, which we reword:

1. Did the Division err in ordering restitution for transactions for which the aggrieved consumers did not testify?

2. In calculating restitution, may the Division decline to deduct the violator's expenses?

3. Does the Consumer Protection Act authorize holding violators jointly and severally liable for a restitution order?

4. Were Morgan's state and federal constitutional rights violated when the charges against him were adjudicated through the administrative process without a jury?

5. Was Morgan's constitutional right to due process violated when the Division served both investigatory/prosecutorial and adjudicatory functions?

6. Was it proper for the Chief of the Division to determine based on the record, without hearing testimony, that Morgan and Almony violated the Consumer Protection Act?

7. Was there substantial evidence for the Division to find that Morgan had violated the Consumer Protection Act?

8. Was there substantial evidence to support the civil penalties imposed against Morgan?

9. Was there substantial evidence for the Division to find that Almony violated the Consumer Protection Act?

---

**20.** The parties raised and the Circuit Court decided a number of other issues that the appellant and cross-appellant do not raise before this Court.

When this Court reviews the decision of an administrative agency, we employ the same standards as would the circuit court, and the inquiry is not whether the circuit court erred, but rather whether the administrative agency erred. *See Spencer v. Board of Pharmacy,* 380 Md. 515, 523–24, 846 A.2d 341, 346 (2004). Review of most quasi-judicial state administrative decisions, such as the present one, is governed by the Maryland Administrative Procedure Act, Md.Code (1984, 2004 Repl.Vol.), § 10–222 of the State Government Article. *Id.* at 527, 846 A.2d at 348.

We apply "substantial evidence" review to agency findings of fact, overruling factual findings only when they are "unsupported by competent, material, and substantial evidence in light of the entire record as submitted." § 10–222(h)(v); *Spencer,* 380 Md. at 529, 846 A.2d at 349. The standard for substantial evidence review is "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Christopher v. Dept. of Health,* 381 Md. 188, 199, 849 A.2d 46, 52 (2004) (quoting *Board of Physician v. Banks,* 354 Md. 59, 68, 729 A.2d 376, 380 (1999)). We also apply the substantial evidence standard when reviewing mixed questions of law and fact, issues of whether the agency applied the law correctly to the facts. *Charles County v. Vann,* 382 Md. 286, 296, 855 A.2d 313, 319 (2004). As to issues of law, we determine the legal correctness of agency conclusions.[21] § 10–222(h)(3)(i)–(iv); *Christopher,* 381 Md. at 198, 849 A.2d at 52.

---

**21.** Md.Code. (1984, 2004 Repl.Vol.), § 10–222(h) of the State Government Article states as follows:

"(h) *Decision.*—In a proceeding under this section, the court may:
(1) remand the case for further proceedings;
(2) affirm the final decision; or
(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:
 (i) is unconstitutional;
 (ii) exceeds the statutory authority or jurisdiction of the final decision maker;
 (iii) results from an unlawful procedure;
 (iv) is affected by any other error of law;

## IV.

### A. Restitution

The Division appeals three of the Circuit Court's holdings related to restitution. First, the Division challenges the Circuit Court's holding that the Division could not order restitution to consumers who did not testify. Second, the Division appeals the Circuit Court's holding that the Division must deduct Shpritz's expenses in purchasing, maintaining, and selling the property from the restitution calculation. Third, the Division contests the Circuit Court's holding that the Division may not hold violators of the Consumer Protection Act jointly and severally liable for restitution.

#### 1. Consumer Testimony

■ The Division appeals the judgment of the Circuit Court striking the restitution calculations for the thirty-two individuals who did not testify. As we have indicated, the Circuit Court struck the restitution calculations for the thirty-two individuals who did not testify, requiring that "[e]ach individual for whom restitution was ordered must be produced to show when, how, why, where and what for the restitution order to be given." [22]

It is the position of the Division that the Circuit Court erred because, in its view, consumer testimony is not a prerequisite for restitution. The Division maintains that the proper consideration is not whether a particular consumer testified, but rather whether there is substantial evidence to support the order of restitution.

Shpritz maintains that with regard to thirty of the transactions in which the Division ordered him to pay restitution, the Division failed to produce any evidence whatsoever of reliance.

---

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or
(vi) is arbitrary or capricious."

**22.** This ruling applied to Shpritz and Morgan. Victims testified in both cases involving Almony.

Shpritz reasons that there is a distinction between "general" restitution orders and "specific" ones. He defines "general" orders as ones in which the Division orders a certain amount of restitution that will be divided later. In contrast, "specific" orders, such as the restitution order in this case, apportion specific amounts to specific consumers. While acknowledging that Maryland law does not require proof of reliance in advance of "general" orders, Shpritz asserts that testimony showing reliance is required for "specific" orders. He maintains that in the instant case, the Division did not order a general order of restitution, but rather ordered specific restitution, in specific amounts, to specific consumers.

Shpritz conflates the Circuit Court's requirement that all consumers must testify in front of the Division before restitution may be awarded and the requirement that before a violator may be ordered to pay restitution, the Division must show that the consumer relied on the particular misrepresentation. The key is *reliance*. In order to establish a violation of the statute, the Division need not prove reliance; once a statutory violation is proven, then, before restitution is ordered to an individual consumer, the Division must prove consumer reliance. Consumer testimony is not required to prove a statutory violation and is not *necessarily* required to prove reliance for restitution. Whether consumer testimony is required to support a specific restitution order depends upon the facts and circumstances of each case. As we shall explain, in the instant case, to support a specific restitution order, because many of the consumers were complicit in the unlawful scheme, the Division must call them as witnesses either before the Division or in some other comparable proceeding to show that they in fact relied on the misrepresentation to their detriment.

In considering the necessity for consumer testimony, we emphasize that there is a difference between a finding of a statutory violation and an order requiring restitution.[23]

---

**23.** In *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 501 A.2d 48 (1985), we noted that the authority to order restitution is stated express-

The Consumer Protection Act provides that "[a]ny practice prohibited by this title is a violation of this title, whether or not any consumer has in fact been misled, deceived, or damaged as a result of that practice." § 13–302. In *Consumer Publishing*, we noted that in not requiring proof of deception or harm to the consumer, the Consumer Protection Act follows Federal Trade Commission practice. 304 Md. at 770–71, 501 A.2d at 68. We observed that "[t]he Federal Trade Commission has consistently analyzed only the advertisements themselves, without requiring testimony by consumers or consumer experts, and the courts have upheld the practice." *Id.* at 771, 501 A.2d at 69. This practice is permitted based upon the rationale that the Commission has the expertise to determine whether advertisements have the capacity to deceive or mislead the public. *Id.* Similarly, the Maryland Legislature determined, in enacting § 13–302, that the Consumer Protection Division also has the expertise necessary to make that determination without testimony by consumers or consumer experts. *Id.* Accordingly, the Division need not call each consumer to establish an unfair or deceptive practice and need not prove consumer reliance to prove a violation of the statute.

 For the Division to order a violator to pay restitution to a particular individual, however, the Division must determine that the consumer relied upon the misrepresentation. In Maryland, "[t]here is a reliance element in restitution." *Luskin's v. Consumer Protection*, 353 Md. 335, 385, 726 A.2d 702, 727 (1999); *see Consumer Protection v. Outdoor World*, 91

---

ly in the Consumer Protection Act. *Id.* at 776, 501 A.2d at 71. The Act provides, in pertinent part, as follows:

"If, at the conclusion of the hearing, the Division determines on the preponderance of the evidence that the alleged violator violated this title, the Division shall state its findings and issue an order requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property." § 13–403(b)(1). Section 13–402(b)(1) addresses cease and desist orders and restitution specifically, and provides in pertinent part as follows: "... any cease and desist order provided for by this subtitle may include a ... condition for ... (ii)[t]he restitution by the violator ... to the consumer of money, property, or any other thing received from the consumer in connection with a violation ... of this title."

Md.App. 275, 291, 603 A.2d 1376, 1384 (1992) (noting that "actual restitution may not be ordered in the absence of some evidence that the individual purchaser was deceived by and relied upon the offending communication"). We have vacated restitution orders that award restitution to individual consumers without requiring proof of reliance. *See Consumer Publishing*, 304 Md. at 781, 501 A.2d at 74 (holding that a blanket order of automatic restitution to all consumers was improper because restitution to particular purchasers was appropriate only after verification of actual reliance by those purchasers on the company's misleading or deceptive advertisements).

While an individual consumer must make a showing of reliance before the consumer is awarded restitution, the Division may issue general orders of restitution without consumer testimony. In *Consumer Publishing*, a company that sold diet pill plans argued that the Division could not order restitution to all the company's consumers, because the Division had not presented evidence that the purchasers relied on the company's misleading advertisements. *Id.* at 775, 501 A.2d at 71. We held that the Division may issue a general restitution order before the consumers make a showing of reliance. After reviewing cases from other states permitting restitution orders without individualized proof of reliance and scholars' advocacy for such a rule, we stated as follows:

> "While there is no direct evidence that any consumers actually relied on the Company's deceptive or misleading advertisements, we do not believe that such evidence is necessary. In accordance with the authorities previously discussed, we believe that the Division may include a general restitution provision in a cease and desist order without direct proof of consumer reliance."

*Id.* at 781, 501 A.2d at 74. Since the Division may issue a general restitution order without any direct evidence of individual consumers' reliance, the Division need not present consumers as witnesses.

Similarly, in *State v. Andrews*, 73 Md.App. 80, 533 A.2d 282 (1987), the Court of Special Appeals held that the Division

could issue a general restitution order without consumer testimony. The Grecian Spa violated the Consumer Protection Act when it closed its salon, weight loss, and exercise facilities despite representing to consumers who purchased memberships that the spa's services would be available through the duration of their memberships. *Id.* at 82–83, 533 A.2d at 284. The Circuit Court held that the Division could award restitution only to consumers who testified at trial. *Id.* at 83, 533 A.2d at 284. Relying on *Consumer Publishing,* the Court of Special Appeals reversed. The court held that "the testimony of consumer claimants at trial is not a prerequisite to recovery in a consumer protection action involving numerous similarly situated victims and that oral testimony is not the only method for establishing entitlement." *Id.* at 84, 533 A.2d at 284. The court explained that requiring all consumers to testify would run counter to the Consumer Protection Act's public enforcement provisions. The court stated as follows:

"Nowhere in the Act is there any indication that the framers intended live, in court, testimony to be a prerequisite to recovery. By providing for a 'public remedy' through the Office of the Attorney General, in addition to the private right of action referred to in § 13–408, the General Assembly implicitly recognized that many consumers will be deterred from pursuing individual actions due to the cost and time involved in private litigation. The procedure required by the circuit court in this case flies in the face of the General Assembly's logic because it increases the 'private' costs of the 'public' remedy by requiring that each aggrieved individual come to court and give live testimony."

*Id.* at 85, 533 A.2d at 285.

When a violator's misrepresentations and deceptions affect a number of similarly situated individuals, like the purchasers of diet pill plans in *Consumer Publishing* and spa memberships in *Andrews,* the Division may issue a general order of restitution. In order to award restitution to individual consumers, however, the Division then must establish a procedure to determine whether individual consumers relied on the misrepresentations. We said in *Consumer Publishing:*

"Although we reject the Company's broad argument that proof of reliance is necessary before a general restitution order may issue, we do recognize that some of those purchasing the Company's products may not have relied on the false impressions created by the advertisements. Some of these consumers may not want refunds. Accordingly, we believe that the Division's order was defective because it did not provide a procedure for processing individual consumer claims. We agree with the cases in other jurisdictions which, under statutes like Maryland's, require that a restitution order provide a procedure for individual determination of consumer restitution claims. The Division may not simply require the mailing of refunds to all Maryland consumers who bought Company products during a certain period. Purchasers should be notified that they may obtain a refund; in order to be entitled to such refund, they should be required to state that they relied on the false impressions created by the advertising. In this way, purchasers who were not deceived will not receive an 'automatic' refund. It should not be necessary that each purchaser present additional evidence that he was actually deceived and relied on the misrepresentations in the advertisements. To require proof of reliance, beyond the purchaser's statement, would make recovery difficult and complicated."

304 Md. at 781, 501 A.2d at 74. The Division, thus, can issue a general order of restitution without proving an individual consumer's reliance, but may not award restitution to the individual consumer without a showing of individual reliance.

■■■ The Division argues, however, that it could issue a specific order of restitution in this case, without making a showing of reliance, because reliance is inherent here. It is accurate that the consumers could not have obtained the FHA-insured mortgages without the appraisers, sellers, and lenders' misrepresentations. Regarding the appraisers, Department of Housing and Urban Development regulations require the appraised value be disclosed to the consumer, 24 C.F.R. § 203.15 (2004), and if the appraiser finds the sales price greater than the true market value, then the FHA-

insured mortgage cannot be issued and the borrower may cancel the transaction without penalty. *See* HUD–91322.3. Similarly, the purchasers would not have been able to obtain the mortgages necessary for the property sale had Shpritz not made illegal payments to the consumers and misrepresented the consumers' financial situation and had American Skycorp and Woody not approved the mortgages.

It is not accurate, however, that reliance is inherent, because some consumers could have been complicit or willing purchasers. The Circuit Court concluded "that most of the buyers were looking for that free lunch and willing to participate in the misrepresentation to obtain the home they desired, and probably could not have otherwise purchased." Indeed, there is evidence that at least some of the consumers were complicit in Shpritz's misrepresentations to the FHA. Such complicity could have precluded reliance on some or all of the violators' misrepresentations. Independent of any complicity, some of the consumers might have been willing to purchase the properties at inflated rates. As the Division notes, the consumers were first-time purchasers with poor credit histories. In some cases, the individual consumer's desire to purchase a home might have outweighed the consideration of price. The ALJ recognized this possibility when she wrote, "While some of the buyers were more than happy to be able to purchase a house they never thought they could afford, had some material facts not been omitted, some buyers may have seriously rethought their decision to go ahead with a deal that seemed too good to be true."

 We agree with Shpritz that the record is devoid of any evidence to support a specific restitution order regarding the non-testifying home purchasers, *i.e.*, that there is no evidence of reliance. We hold that the Division presented no evidence that these consumers relied on the sellers, lenders, or appraisers' misrepresentations. That we vacate the restitution awards for these consumers does not preclude the Division from awarding them restitution in the future. Having proved by substantial evidence Consumer Protection Act viola-

tions and having established in the Cease and Desist Order a method for calculating restitution, the Division may initiate a procedure for awarding the consumers restitution. Through this procedure, the Division must determine whether the individual consumers relied on Morgan, Shpritz, or Almony's misrepresentations. Considering the possibility of complicity, the Division can show reliance only if the individual consumers testify.[24]

## 2. Shpritz's Expenses

 The Division appeals the Circuit Court's holding that it must deduct Shpritz's contributions to the transactions in calculating the restitution he must pay. We agree with Shpritz and the Circuit Court.

There are two types of deductions involved in this case: (1) investments to repair and refurbish the properties in preparation for resale, and (2) illegal payments to the consumers, such as payments of the consumers' debt and closing costs. In general, the Division contends that restitution is measured by the amount the violator received. The Division labels the repair and refurbishment costs "business expenses" and argues that such costs should not be deducted. The Division argues that crediting Shpritz for his illegal payments would violate public policy.

Shpritz responds that restitution is the required disgorgement of benefits unlawfully obtained, and as such, it is not "damages." Restitution should be measured by a merchant's "net" profits as a result of a violation of the Act.

 Restitution involves the disgorgement of unjust enrichment. Quoting Dobbs, *Law of Remedies* § 4.1 (1973), in

---

**24.** The Division has recognized implicitly the need for such a procedure regarding complicity. In its Final Order, the Division instructs the Division's investigatory/prosecutorial arm to submit a request proposing how the restitution should be distributed; the Order notes that "it is possible that a person other than the consumer, such as the FHA, might be the appropriate recipient of some of the restitution."

*Consumer Publishing,* we contrasted restitution to damages, stating as follows:

> " 'The damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep. . . .

> " 'Restitutionary recoveries often amount to about the same as the plaintiff's losses, and thus serve many of the compensatory purposes served by a damages recovery. The justification lies, however, in the avoidance of unjust enrichment on the part of the defendant.' "

304 Md. at 776, 501 A.2d at 71–72; *see also Luskin's,* 353 Md. at 384–85, 726 A.2d at 726–27 (holding that restitution for a company's deceptive free airline ticket promotion should be measured by the additional net profit from selling more of its inventory).

In this case, the unjust enrichment is Shpritz's additional profit from his deception. As Shpritz flipped the properties, selling them very soon after he purchased them, his increased profit will mirror his actual profit from the sales. In measuring restitution, the Division should deduct Shpritz's investments in repairing and refurbishing the houses. In his testimony, Shpritz's employee, Robert Stagmer, described the repairs as follows:

> "Well, first of all, the roof is checked, plumbing and electrical are checked. Our people go in then and begin reconditioning the house. The walls are gone over, whatever needs to be done there. Many times we replace the windows. And then the house is checked for any structural—potential structural problems, and those are solved, whatever they might be. Often we replace doors, outside doors and inside doors. And then finally the house is prepared in terms of maybe a new kitchen, new bathroom, if necessary. Then basically the final thing is the house is painted and then the floors are redone or carpet is placed on the floors. And

when the houses are finished, they're in very good condition."

The Division's expert, Robert Hinton, testified that these activities constitute "normal maintenance," as opposed to "rehabilitation," which he defined as "bringing the property up to modern standards, such as a modern kitchen, modern wiring, modern plumbing fixtures." Either way, Shpritz invested money in the houses. The Division confuses matters by labeling these investments "business expenses." The Division need not deduct expenses incurred as part of maintaining a business, such as rent, office supplies, utilities, and regular salaries, but it must deduct investments in purchasing, repairing, and refurbishing the house.

The Division also should deduct the payments Shpritz made to the purchasers, albeit those payments were not in accordance with the law. In so ruling, we do not condone the unlawful transactions, but instead apply the rules for restitution rather than impose civil or criminal penalties. By seeking to compel Shpritz to pay these amounts again, the Division forsakes unjust enrichment for what is in effect punitive damages. As we have held, "any punitive assessment under the CPA [Consumer Protection Act] is accomplished by an imposition of a civil penalty recoverable by the State under § 13–410, as well as by criminal penalties imposed under § 13–411." *Golt v. Phillips,* 308 Md. 1, 12, 517 A.2d 328, 333 (1986); *accord Luskin's,* 353 Md. at 387, 726 A.2d at 727. Accordingly, the Division must recalculate its restitution order to exclude the actual costs incurred by Shpritz.

### 3. Joint and Several Liability

The Division appeals the Circuit Court's holding that violators of the Consumer Protection Act may not be held jointly and severally liable for restitution. The Division argues that it has the power to order joint and several liability, reasoning that joint liability is a common law tort principle under which all the tortfeasors are liable for the injuries they inflict and that a violation of the Act is in the nature of a tort action. Joint liability is proper, the Division argues, because in this

case appellees are concurrent tortfeasors and participated in a common scheme.

Almony's argument primarily is a factual one. He argues that restitution may be imposed, if at all, on a several basis, but not on a joint and several basis. The essence of his argument is that joint and several liability requires a showing of some concert of action combining to result in a single harm and that such evidence is lacking in this case. As an alternative argument, Almony asserts that even if this Court finds him jointly and severally liable, he can be jointly and severally liable only for that part of the restitution order involving the two properties he appraised—4320 Seidel Avenue and 4106 Harris Avenue.

Morgan's argument also is primarily a factual one. He contends that joint and several liability is improper because there is no "substantial evidence of substantial participation in a scheme to mislead or deceive consumers."

Shpritz's argument is a legal one. He contends that restitution is, by its nature, several, because restitution is calculated by the benefit each wrongdoer received.

The issue of whether restitution ordered under the Consumer Protection Act, when brought by the Attorney General in a public enforcement action, may be joint and several as opposed to several is one of first impression before this Court. The resolution of this question is a close one, with little legislative guidance for us to ascertain legislative intent. The Act does not provide explicitly for joint and several liability, the Act provides no textual guidance as to how restitution is to be ordered, and the legislative history sheds no light on the issue.

In resolving this question, we are mindful of several precepts. First, we look to the purpose of the Act. Section 13–102 sets out the declaration of findings and purpose of the Act. The Legislature stated as follows:

"The General Assembly of Maryland finds that consumer protection is one of the major issues which confront all levels of government, and that there has been mounting

concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit."

Section 13–102(a)(1). The Legislature concluded as follows:

"The General Assembly concludes, therefore, that it should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland. It is the purpose of this title to accomplish these ends and thereby maintain the health and welfare of the citizens of the State."

Section 13–102(b)(3). Second, in § 13–105, the Legislature mandated that the Act "be construed and applied liberally to promote its purpose." Finally, in construing "unfair or deceptive trade practices," the Legislature required that "due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." § 13–105; *Golt,* 308 Md. at 10, 517 A.2d at 332 n. 3.

A review of federal cases brought by the Federal Trade Commission reveals that restitution under the federal Act is awarded on a joint and several basis. It appears to be a regular practice and remedy under the federal Act.

In *Fed. Trade Comm'n v. Gem Merch. Co.,* 87 F.3d 466 (1996), the United States Court of Appeals for the Eleventh Circuit let stand a restitution order holding both the Corporation and the individual jointly and severally liable. *Id.* at 468. The individual, Estfan, argued that he was found liable on the basis of corporate acts with which he was involved and that under corporate liability only consumer redress would be permissible. He argued that "disgorgement is not an appropriate remedy in this case because he was not found individually liable." *Id.* at 470. The court rejected his argument, holding him liable individually as well as the Corporation. The court stated:

"Estfan misunderstands the basis of his liability. He is individually liable. The fact that the actions for which he

was responsible were performed by Gem Merchandising does not lessen his individual liability. Once the FTC has established corporate liability, 'the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them.... The FTC must then demonstrate that the individual had some knowledge of the practices.' *Amy Travel Service, Inc.*, 875 F.2d at 573. Having found that Estfan had direct control over the activities of Gem Merchandising, and that he was aware of the illegal practices, the court properly held Estfan individually liable."

*Id.; see also Fed. Trade Comm'n v. Gill,* 71 F.Supp.2d 1030, 1050 (C.D.Cal.1999) (awarding restitution against Gill and Murkey, jointly and severally); *Fed. Trade Comm'n v. Atlantex Assocs.,* 1987–2 Trade Cas. (CCH) Para. 67,788 (S.D.Fla. 1987) (holding defendants jointly and severally liable for violations of § 5 of the federal Act); *Fed. Trade Comm'n v. Publ'g Clearing House, Inc.,* 1995–1 Trade Cas. (CCH) Para. 71,006, 1995 WL 367901 (D.Nev.1995) (rejecting defendant's argument that restitution was proper only to the extent of her *de minimis* participation in the offense and awarding restitution jointly and severally); *Fed. Trade Comm'n v. Cyberspace.com, LLC, et al.,* 2003–1 Trade Cas. (CCH) Para. 73,960, 2002 WL 32060289 (W.D.Wash.2002) (holding that the FTC had shown that, as a matter of law, all defendants were jointly and severally liable for the corporate misconduct of the subsidiaries); *cf. Sec. and Exch. Comm'n v. Blatt,* 583 F.2d 1325, 1335 n. 31 (5th Cir.1978) (noting that the district court ordered a party to share jointly and severally in payment of the trustee's expenses); *Fed. Trade Comm'n v. Int'l Diamond Corp.,* 1983–2 Trade Cas. (CCH) Para. 65,725, 1983 WL 1911 (N.D.Cal. 1983) (holding that any of the defendants found liable under § 13(b) of the federal Act will be held jointly and severally liable for the monetary equivalent of rescission); *Fed. Trade Comm'n v. Kitco of Nevada, Inc.,* 612 F.Supp. 1280, 1281 (D.Minn.1985) (finding the defendants jointly and severally liable under the § 13(b) of the federal Act for the monetary equivalent of rescission).

After reviewing the purpose of the Maryland Act, affording the Act the liberal construction as required by the General Assembly, and considering what appears to be a longstanding federal practice, we hold that the Division may award restitution jointly and severally.

We next consider whether the Division may award restitution jointly and severally in this case. In its Order, the Division applied joint and several liability to parties with two types of relationships. First, the Division held individuals and the companies they own jointly and severally liable: Shpritz and his companies, Woody and American Skycorp, and Almony and Almony Appraisal Services. Second, the Division held the sellers, lenders, and appraisers all jointly and severally liable to each other. In this second category, the Division raises two bases for joint and several liability: concerted and concurrent action.

We first address the test for holding individuals jointly and severally liable for restitution when the Division has determined that the corporation has violated the Consumer Protection Act. As cited *supra*, a number of federal circuit courts have addressed this issue and adopted the standard articulated in *Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir.1989). In *Amy Travel*, the FTC charged three corporations and two individuals who owned and directed the corporations with deceptive trade practices in the marketing of discount vacations. *Id.* at 566. On appeal, the defendants challenged the decision to hold all of them jointly and severally liable for restitution to consumers. *Id.* at 573.

The United States Court of Appeals for the Seventh Circuit adopted the following three prong test for holding individuals jointly and severally liable with corporations for deceptive practices:

"An individual may be held liable under the FTCA for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. Once corporate liability is estab-

lished, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them. Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. The FTC must then demonstrate that the individual had some knowledge of the practices."

*Id.* at 573 (citations omitted). The court defined knowledge as including "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth" and noted that "the degree of participation in business affairs is probative of knowledge." *Id.* at 574 (citations omitted). The court then looked to the individuals' involvement in all aspects of the business and authorship of the deceptive scripts and held the individuals to be jointly and severally liable. *Id.* at 574–75.

The *Amy Travel* standard requiring participation or control and knowledge is consistent with the standard we have adopted in the tort context. In *Tedrow v. Deskin,* 265 Md. 546, 290 A.2d 799 (1972), the purchaser of a used car sued the car dealership, its owners, and employees claiming that they had altered the odometer. In addressing whether the individual defendants could be held liable for the Corporation's acts, we stated the following:

"The general rule is that corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body. Of course, participation in the tort is essential to liability. If the officer takes no part in the commission of the tort committed by the corporation, he is not personally liable therefor unless he specifically directed the particular act to be done, or participated or cooperated therein. It would seem therefore, that an officer or director is not liable for torts of which he has no knowledge, or to which he has not consented. . . .

"The superior or managing officer of a corporation cannot be held liable for the misconduct of a subordinate servant or employee unless the act is done with his consent or under his order or direction. But liability is not limited to tortious acts which he actually and physically commits; it extends as well to tortious acts which he actually brings about."

*Id.* at 550–51, 290 A.2d at 802–03 (citations omitted). Accordingly, we held that Tedrow was entitled to prove his allegations that the individuals were liable. *Id.* at 552, 290 A.2d at 803; *accord Metromedia v. WCBM Maryland,* 327 Md. 514, 519–21, 610 A.2d 791, 794–95 (1992) (quoting *Tedrow* and holding that the owner of WCBM could be held liable for WCBM's alleged unlawful detention of Metromedia's property, because he participated in the alleged activity).

*Amy Travel* is also consistent with Court of Special Appeals jurisprudence interpreting the Maryland Consumer Protection Act. In *State Collection v. Kossol,* 138 Md.App. 338, 771 A.2d 501 (2001), the Consumer Protection Division found corporations and individuals liable for deceptive and misleading practices in the sale of food plans and freezers. The Circuit Court held that Kossol, who was an officer of the Corporations and participated in the deceptive acts, could not be held jointly and severally liable with the Corporation. After quoting the ALJ's conclusions, which cited *Tedrow, Metromedia,* and *Amy Travel,* the Court of Special Appeals held that Kossol could be held jointly and severally liable for restitution, because he personally violated the Consumer Protection Act and received benefits from the corporation. *Id.* at 348–49, 771 A.2d at 507.

Accordingly, we adopt the *Amy Travel* standard set out by the Seventh Circuit. We hold that the Consumer Protection Division may hold individuals jointly and severally liable for restitution for the Consumer Protection Act violations of corporations, when the Division proves that (1) the individual participated directly in or had authority to control the deceptions or misrepresentations, and (2) the individual had knowledge of the practices.

The Circuit Court ruled that joint and several liability is not applicable in this case. We disagree and hold that joint and several liability is proper as to Shpritz and Almony and their respective companies' violations. Shpritz participated directly in and had knowledge of his companies' Consumer Protection Act violations. Similarly, assuming that there was sufficient evidence to support the Division's findings against Almony Appraisal Services, an issue we will discuss *infra*, the Division could hold Almony individually liable. It is undisputed that Almony performed the two appraisals. Therefore, if there were Consumer Protection Act violations through the appraisals, Almony participated in and had knowledge of the violations.

Next, we consider whether the Division properly held Shpritz and his companies, Woody and American Skycorp, Morgan, and Almony and his company, each jointly and severally liable. While Consumer Protection Act violations are not tortious acts, we again look for guidance from the law of joint and several liability developed in the tort context. We have recognized joint and several liability for "true" joint tortfeasors, defined as tortfeasors who act in concert, and "concurrent" tortfeasors. *See Underwood–Gary v. Mathews*, 366 Md. 660, 669–70, 785 A.2d 708, 713–14 (2001); *Morgan v. Cohen*, 309 Md. 304, 310–17, 523 A.2d 1003, 1005–09 (1987). The Division argues that we should apply both categories of joint tortfeasors to the Consumer Protection Act context and hold the parties jointly and severally liable based on concerted and concurrent action.[25]

---

**25.** While the Division argues in its brief that the Consumer Protection Act is "in the nature of a tort action" and labels the appellees "tortfeasors," the Division recognized at the administrative hearings that Consumer Protection Act violations are not torts and that any reference to tort law is by analogy only. In its closing statement before the ALJ, the Division stated repeatedly that Consumer Protection Act enforcement actions are not tort actions. For example, the Division stated, "This is not a criminal trial and this is not a negligence trial and it's not a tort action. This is a statutory claim under the Consumer Protection Act." The Division later argued in closing that while the Division's claims "are not tort claims in the strict sense," Maryland courts have "analo-

A review of the rationales for joint and several liability for concerted and concurrent action reveals that only concerted action applies to the Consumer Protection Act context. In discussing concert of action, we repeatedly have cited William L. Prosser, *Joint Torts and Several Liability*, 25 Cal. L.Rev. 413 (1936). *See, e.g., Morgan*, 309 Md. at 311, 523 A.2d at 1006; *Trieschman v. Eaton*, 224 Md. 111, 115, 166 A.2d 892, 894 n. 3 (1961). In that article, Prosser wrote as follows:

> "A. *Concerted action.* It is settled definitely that all who act in concert will be liable for the entire result.... Those who actively participate in the wrongful act, by cooperation or request, or who lend aid, encouragement or countenance to the wrongdoer, or approval to his acts done for their benefit, are equally liable with him. Express agreement is not necessary; all that is required is that there shall be a common design or understanding."

Prosser, *supra*, at 429–30 (footnotes omitted). The rationale for joint and several liability for this category is that tortfeasors who joined together should be liable for the entire damage, independent of whether any one of them directly caused more or less of the damage. Prosser's rationale is as follows:

> "There was a common purpose, with mutual aid in carrying it out; in short, there was a joint enterprise, so that 'all coming to do an unlawful act, and of one party, the act of one is the act of all of the same party being present.' Each was therefore liable for the entire damage, although one might have battered the plaintiff, while another imprisoned him, and a third stole his silver buttons."

*Id.* at 414 (quoting *Sir John Heydon's Case* 11 Co. Rep. 5, 77 Eng. Rep. 1150 (1613)) (footnotes omitted).

■ In contrast, the predicate for concurrent tortfeasors' joint and several liability is the indivisibility of the injury. We have long recognized that when tortfeasors act independently

---

gized" Consumer Protection Act violations to torts when determining liability.

and their acts combine to cause a single harm, the tortfeasors are jointly and severally liable. *See Morgan,* 309 Md. at 316, 523 A.2d at 1008 (discussing whether the defendants' torts were concurrent); *Balto. Transit Co. v. Bramble,* 175 Md. 334, 348, 2 A.2d 416, 423 (1938) (noting that "the general rule is that, where the injury to the plaintiff is the result of concurring causes, the question is one which should be submitted to the jury").

█ Under the "single indivisible injury rule" or "single injury rule," the necessary condition for concurrent tortfeasors to be held jointly and severally liable is that they caused a single injury incapable of apportionment. *See Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 260, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1979) (noting that the common law "allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident"); *Mitchell v. Gilson,* 233 Ga. 453, 211 S.E.2d 744, 745 (1975) (upholding the lower court's holding that concurrent tortfeasors were jointly and severally liable when they produced a single indivisible injury and the resulting damages lacked a rational basis for apportionment); *Ruud v. Grimm,* 252 Iowa 1266, 110 N.W.2d 321, 324 (1961) (holding that "where two or more persons acting independently are guilty of consecutive acts of negligence closely related in point of time, and cause damage to another under circumstances where the damage is indivisible . . . the negligent actors are jointly and severally liable"); *Palleschi v. Palleschi,* 704 A.2d 383, 385 n. 3 (Me.1998) (defining the "single injury rule" as "when joint tortfeasors by their separate negligent acts cause a single injury that is incapable of apportionment, each actor is liable for the entire amount of the damages"); *D & W Jones, Inc. v. Collier,* 372 So.2d 288, 294 (Miss.1979) (holding that "the separate, concurrent and successive negligent acts of the appellees which combined to proximately produce the single, indivisible injury to appellant's property . . . rendered appellees jointly and severally liable"); *Azure v. City of Billings,*

182 Mont. 234, 596 P.2d 460, 469–71 (1979) (discussing the origins of the single indivisible injury rule); *Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (1952) (holding that where "the tortious acts of two or more wrongdoers join to produce an indivisible injury . . . all of the wrongdoers will be held jointly and severally liable"); Restatement (Second) of Torts § 879 (1979) (stating that "[i]f the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether their conduct is concurring or consecutive"); *cf.* Restatement (Second) of Torts § 881 (stating for apportionable injuries that "[i]f two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused").

An indivisible injury is required, because the rationale for holding concurrent tortfeasors jointly and severally liable is premised on the indivisibility of liability. As Judge Learned Hand explained in *Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co.*, 98 F.2d 694 (2nd Cir. 1938), in cases with indivisible injuries, if the plaintiff had the impossible burden of proving each concurrent tortfeasor's share of liability, then the plaintiff would not be able to recover any damages. *Id.* at 697. This "absurd result" is solved by shifting the burden of apportioning liability to the defendants through joint and several liability. *Id.* William L. Prosser and John Henry Wigmore employed the same rationale in arguing for holding concurrent tortfeasors jointly and severally liable in cases of single, indivisible injuries. Prosser wrote as follows:

"D. *Concurrent causation of a single, indivisible result, which neither would have caused alone.* Where the acts of two defendants combine to produce a single result, which is incapable of being divided or apportioned—such as the death of the plaintiff—each may be the proximate cause of

the loss, and each may be held liable for the entire damage. . . .

"Entire liability in these cases rests upon the obvious fact that each defendant is responsible for the loss, and the absence of any logical basis for apportionment. . . ."

Prosser, *supra,* at 432. Wigmore wrote as follows:

"The rule should be: *Wherever two or more persons by culpable acts,* whether concerted or not, *cause a single general harm, not obviously assignable in parts to the respective wrongdoers,* the *injured party may recover from each of the whole.* In short, wherever there is any doubt at all as to how much each caused, take the burden of proof off the innocent sufferer; make any one of them pay him for the whole, and then let them do their own figuring among themselves as to what is the share of blame for each."

John Henry Wigmore, *Joint–Tortfeasors and Severance of Damages; Making the Innocent Party Suffer Without Redress,* 17 Ill. L.Rev. 458, 459 (1923); *see also Azure,* 596 P.2d at 469–71 (discussing the single indivisible injury rule and citing Hand, Prosser, and Wigmore).

In *Woods v. Cole,* 181 Ill.2d 512, 230 Ill.Dec. 204, 693 N.E.2d 333 (1998), the Illinois Supreme Court articulated the different reasons for joint and several liability for concerted action and concurrent torts. The special administrator of Woods's estate brought a wrongful death action, claiming that Cole negligently entrusted Hill with a firearm and made Hill think that the gun would be empty when he pointed it at Woods and pulled the trigger. *Id.* at 204, 693 N.E.2d at 334. The sole issue was whether a comparative negligence statute mandated that the damages be apportioned between him and his fellow two tortfeasors, with whom he had acted in concert. *Id.* at 204, 693 N.E.2d at 335. In considering this question, the court distinguished between the common law joint and several liability doctrines for concurrent and concerted action torts. The court explained as follows:

"In perhaps the most frequently occurring situation, a tortfeasor who acts independently and concurrently with other

individuals to produce an indivisible injury to a plaintiff may be held jointly and severally liable for that injury, even though the tortfeasor does not act in concert with the other individuals, and shares no common purpose or duty with them. Such an 'independent concurring tortfeasor' is not held liable for the entirety of a plaintiff's injury because he or she is responsible for the actions of the other individuals who contribute to the plaintiff's injury. Rather, an independent, concurring tortfeasor is held jointly and severally liable because the plaintiff's injury cannot be divided into separate portions, and because the tortfeasor fulfills the standard elements of tort liability, *i.e.*, his or her tortious conduct was an actual and proximate cause of the plaintiff's injury. The fact that another individual also tortiously contributes to the plaintiff's injury does not alter the independent, concurring tortfeasor's responsibility for the entirety of the injury which he or she actually and proximately caused.

"In contrast, a tortfeasor who acts in concert with other individuals in causing a plaintiff's injury is held jointly and severally liable for that injury because the tortfeasor is legally responsible for the actions of the other individuals. A determination that a tortfeasor has acted in concert with other individuals establishes a legal relationship with those individuals. By virtue of this relationship, the tortfeasor becomes liable for the actions of those with whom he acted in concert. . . . Thus, while the tortfeasors who act in concert in causing a plaintiff's injury may all engage in some affirmative conduct relating to that injury, the legal relationship which exists among them eliminates the possibility of comparing their conduct for purposes of apportioning liability. Indeed, if an apportionment of liability were permitted, the act of one tortfeasor would no longer be the act of all, and the essence of the doctrine of concerted action would be destroyed."

*Id.* at 204, 693 N.E.2d at 336–37 (citations omitted). The court then concluded "it is legally impossible to apportion liability among tortfeasors who act in concert," and thus, the

comparative negligence statute could not apply to tortfeasors acting in concert. *Id.* at 204, 693 N.E.2d at 337.

■ We agree with the Illinois Supreme Court that tortfeasors acting in concert and concurrent tortfeasors are jointly and severally liable based on different rationales. Tortfeasors acting in concert legally are responsible for the tortious actions each commits. In such situations, there is no apportionment of liability between them. *See also* Prosser, *supra*, at 414 (stating that in cases of concerted action "[t]he jury would not be permitted to apportion the damages").[26] Concurrent tortfeasors are not responsible for each other's actions, because concurrent tortfeasors do not act in concert. Instead, concurrent tortfeasors are held jointly and severally liable to prevent the "absurd result" articulated by Hand, Prosser, and Wigmore that would follow from burdening plaintiffs with apportioning damages in cases of indivisible injury. This result is not considered unjust, as each concurrent tortfeasor caused the harm.

Applying the rationales for these two categories of tortfeasors to the consumer protection context, we hold that only violators who act in concert may be held jointly and severally liable for restitution under the Consumer Protection Act. The rationale for concerted action applies in the Consumer Protection Act context. The maxim that "the act of one is the act of all" carries equal force in both contexts. As tortfeasors acting in concert are responsible for the damages each caused, so too are Consumer Protection Act violators who act in concert responsible for the unjust enrichment each gained at the consumers' expense.

---

26. Some commentators have explained joint and several liability for concerted action as based on the difficulty of apportioning damages. *See* John Henry Wigmore, *Joint–Tortfeasors and Severance of Damages; Making the Innocent Party Suffer Without Redress*, 17 Ill. L.Rev. 458, 458 (1923) (describing difficulties in apportioning damages as the "reason" for joint and several liability when there is concerted action and arguing that the same rationale applies for concurrent tortfeasors); *see also* Roy D. Jackson, Jr., *Joints Torts and Several Liability*, 17 Tex. L.Rev. 399, 420–21 (1939) (arguing in support of Wigmore's position).

On the other hand, the rationale for holding concurrent tortfeasors jointly and severally liable does not apply to concurrent violators of the Consumer Protection Act. Concurrent tortfeasors are not responsible for each other's actions— the parties acted independently of each other. Instead, they each are responsible for the indivisible damage they caused. The rationale for holding concurrent tortfeasors jointly and severally liable is inapplicable in the Consumer Protection Act context, where restitution aims at disgorgement of unjust enrichment, not compensation for damages. *Luskin's,* 353 Md. at 383–84, 726 A.2d at 726; *Consumer Publishing,* 304 Md. at 776, 501 A.2d at 71–72. A damage assessment looks to the harm to the victim; restitution looks to the gain or unjust enrichment of the violator. While the injury may be indivisible, the amount of illicit gain by each violator ordinarily can be ascertained.

■ We hold that the Division may hold violators of the Consumer Protection Act who have acted in concert jointly and severally liable for restitution, but the Division may not hold concurrent violators of the Consumer Protection Act jointly and severally liable for restitution.

■ We turn now to the concept of concert of action. Prosser defines acting in concert of action as "actively partic- ipat[ing] in the wrongful act, by cooperation or request, or [lending] aid, encouragement or countenance to the wrong- doer, or approval to his acts done for their benefit." Prosser, *supra,* at 429–30. The Second Restatement defines concert of action as follows:

"For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

Restatement (Second) of Torts § 876 (1979). We adopt the Second Restatement's definition of concerted action to determine whether parties are jointly and severally liable for restitution under the Consumer Protection Act.

■■ Applying this standard, we hold that the Division could hold Shpritz and his companies and Woody and American Skycorp jointly and severally liable. There is substantial evidence based on documentary evidence and the testimony of Robert Stagmer, Shpritz's employee, and Elvera McCann, former chief underwriter and vice president of American Skycorp, to show a concert of action between Shpritz and his companies and Woody and American Skycorp. Shpritz and Woody had a longstanding relationship, commencing when Woody worked at Capital Mortgage Bankers before he founded American Skycorp. Woody served as loan officer for properties Shpritz sold. When Woody left Capital Mortgage Bankers to form American Skycorp, Shpritz moved his business to Woody's new company. On each transaction, Woody and Shpritz knew of each other's activities. For each property, Shpritz brought the loan applications directly to Woody, who then assigned the applications to a loan officer. Woody was the loan officer himself on some of the properties. Shpritz was employed by American Skycorp as a loan officer from June to November 1998. During this time, he operated as the loan officer and seller for certain properties, a clear conflict of interest countenanced by Woody and American Skycorp that violated American Skycorp's safeguarding role as a Direct Endorsement lender. *See* No. 4000.4 at 1–14 (prohibiting a person who is both the seller and an employee of the lender from participating in processing the mortgage application). Woody often overrode underwriters' objections to loan applications and approved the loans.

Additionally, Woody and American Skycorp instructed Shpritz on some of the practices he then used to violate the

Consumer Protection Act. Shpritz learned from Woody while Woody was employed at Capital Mortgage Bankers how to pay consumers' closing costs through gift letters and how to pay consumers' debts. An American Skycorp employee recommended to Shpritz that he utilize non-profit organizations for gift letters. Based on these facts, the Division presented substantial evidence to establish that Shpritz, his companies, Woody, and American Skycorp knew of each other's breach of duty and substantially assisted or. encouraged the breach.

Similarly, we conclude that there was substantial evidence for the Division to hold Morgan jointly and severally liable with Shpritz, his companies, Woody, and American Skycorp. Morgan had a longstanding relationship with Woody. Morgan testified that he met Woody in the 1980s or early 1990s when Morgan was a staff appraiser and Woody was a loan officer for First Home Mortgage. The relationship continued as Morgan performed appraisals for Woody when Woody was a loan officer for Capital Mortgage Bankers. Morgan then became a regular appraiser for American Skycorp; McCann estimated that Morgan wrote approximately fifty appraisal reports per month for American Skycorp.

Under cross-examination, Morgan acknowledged that in a number of instances he was aware of discrepancies between the owner listed on the property deed and the seller on the sales contract, Shpritz's company West Star Properties. In other words, Morgan acknowledged that he knew of the likelihood that there had been a recent prior sale of the property. Morgan testified that he spoke to Woody and Shpritz "quite a bit" about the discrepancies, but that they provided him with no additional information. Despite the *Uniform Standards of Professional Appraisal Practice's* rules mandating that an appraiser comment on his efforts to obtain information on prior sales, *Advisory Opinion AO–1, supra* (citing Standard Rule 2–2 as requiring "that, if sales history information is unobtainable, the written appraisal report must include a commentary on the efforts taken by the appraiser to obtain the information"), Morgan did not note his contacts

with Woody and Shpritz in his appraisal report. Instead, Morgan wrote "no transfer" in the appraisal report's space for prior sales. Morgan acknowledged that when he first performed appraisals for American Skycorp, he would write "unknown" when there were discrepancies between the deed and sales contract. He testified that an American Skycorp underwriter, whom he could not identify, sent a note to appraisers instructing that they write "no transfer."

Based on these facts, the Division's decision to hold Morgan jointly and severally liable with the sellers and lenders is supported by substantial evidence. There is substantial evidence to hold Morgan jointly and severally liable under both grounds (b) and (c) of the Restatement's definition of concerted action. First, as a result of his fruitless discussions with Shpritz and Woody, Morgan knew that they were concealing the sales history of the properties. As an experienced appraiser, Morgan knew that Woody, as lender, was breaching his duty to the purchasers and the Federal Housing Administration to investigate the value of the properties. Morgan also knew that Shpritz was breaching his duty to disclose information to the lender and consumer and that Shpritz's concealing of the prior sales history would indicate that Shpritz was inflating the price of the properties. Morgan gave substantial assistance to Shpritz, his companies, Woody, and American Skycorp in their efforts. By failing to note the discrepancies between the deeds and the sales contracts, Morgan further concealed the prior sales history from other American Skycorp employees reviewing the appraisal and from any FHA review appraiser.

Second, Morgan is jointly and severally liable, because he gave substantial assistance to Shpritz, his companies, Woody, and American Skycorp in the breaches of their duties and because his conduct separately considered constitutes a breach of duty to the consumers. As discussed, Morgan provided substantial assistance to the other parties. Morgan's failure to note the prior sales or to describe the discrepancies between owners listed on the deeds and sales contracts constitut-

ed a breach of duty, because it violated his duty to adhere to the *Uniform Standards of Professional Appraisal Practice.* By failing to note the discrepancies and instead writing "no transfer," Morgan undermined the purpose of appraisals: to ascertain the value of the property.

 Turning to Almony, we hold that the Division lacks substantial evidence to hold him jointly and severally liable with Shpritz, his companies, Woody, and American Skycorp. There is no evidence to indicate Almony's concerted action with or even knowledge of the other parties' misrepresentations. Almony testified that his only contact with Shpritz was to request access to the properties, a standard practice for appraisers. He also testified that Woody and Hall never instructed him in the preparation of an appraisal. The Division presented no evidence to the contrary.

The Division cannot deduce from its findings of misrepresentation that Almony acted in concert with American Skycorp and Shpritz. Pursuant to the Division's subpoena, Almony produced seventy-five appraisal reports he wrote for American Skycorp. The Division acknowledged at oral argument that it had not read or considered seventy-three of the reports. Without evidence of concerted action, the Division cannot conclude that Almony acted in concert with American Skycorp and Shpritz based solely on a review of 2.7% of the reports Almony performed for American Skycorp.

## B. Constitutional Issues

### 1. Right to a Jury Trial

Morgan appeals, contending that the administrative adjudication violated his state and federal constitutional right to a jury trial under Article 23 of the Maryland Declaration of Rights and the Seventh Amendment to the United States Constitution. He concedes that were the Division seeking a "pure restitution remedy . . . then a jury trial would be less likely," but asserts that the Division in fact seeks monetary damages, triggering his right to a jury trial.

Citing *Maryland Aggregates v. State*, 337 Md. 658, 655 A.2d 886 (1995), the Division responds that there is no right to a jury trial when the Legislature has committed the initial decision making to an administrative agency. The Division argues also that the right to a jury trial does not apply to statutory administrative actions unknown at common law. Finally, the Division points to decisions in other states holding that a state jury trial right did not apply to state consumer protection acts. We agree with the Division and the Circuit Court that Shpritz, Morgan and Almony were not entitled to a jury trial.

■■■■■ The Seventh Amendment to the United States Constitution provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." We reject Morgan's federal constitutional argument, because the Seventh Amendment does not apply to the states. *See Maryland Aggregates*, 337 Md. at 681, 655 A.2d at 897 n. 14.

■■■ The right to a jury trial in Maryland is provided for in the Maryland Constitution. Article 23 of the Maryland Declaration of Rights provides in pertinent part as follows:

"The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of $10,000, shall be inviolably preserved."

Article 5(a) of the Maryland Declaration of Rights provides, in relevant part, as follows:

"That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; and also of all Acts of Assembly in force on the first day of June, eighteen hundred and sixty-seven; except such as may have since ex-

pired, or may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State. And the Inhabitants of Maryland are also entitled to all property derived to them from, or under the Charter granted by His Majesty Charles the First to Caecilius Calvert, Baron of Baltimore."

The Consumer Protection Act was first enacted by Chapter 388 of the Acts of 1967. *See Greene Tree Home Owners, v. Greene Tree Assoc.*, 358 Md. 453, 461, 749 A.2d 806, 810 n. 1 (2000). It is clear from the Act that in the first instance, the General Assembly envisioned administrative adjudication of consumer protection actions, including those in which the Division seeks restitution.[27] Section 13–204(4) grants the Division the power to "issue a cease and desist order with respect to any practice found by the Division to be an unfair or deceptive trade practice." Section 13–403 establishes the administrative procedures for adjudicating cease and desist actions. Section 13–403(a) governs the contours of the administrative hearings. If at the end of the hearing the Division determines by a preponderance of the evidence that violations occurred, the Division must make findings and may issue a cease and desist order. § 13–403(b)(1). The section explicitly authorizes the Division to include restitution in the order; the order can include "requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property." *Id.*[28] In enacting the

---

27. We speak only of actions brought by the Division. Section 13–408 authorizes actions by aggrieved individuals; § 13–408(a) establishes that "any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title." Such actions are brought in courts, outside the administrative process; § 13–408(c) refers to "the court." Whether Maryland's Constitution permits a jury trial for such actions is not before us in this case.

28. The statute envisions administrative assessment of civil penalties as well. Although assessment of civil penalties is not listed in § 13–204, the power to assess such penalties is listed in § 13–410. Section 13–410(c) authorizes the State to recover fines as civil penalties "in a civil action or an administrative cease and desist action under § 13–403(a)

statute, the Legislature gave to the administrative agency the power to proceed administratively against violators of the Act, and, therefore, delegated to the agency initial decision making responsibility with respect to those disputes.

■ Shpritz, Morgan, and Almony do not challenge the legislative delegation of adjudicatory authority to the Division; they only claim that they have a right to a jury trial before the Division. Having determined that the General Assembly authorized administrative adjudication and, thus, did not mandate a jury trial in actions brought by the Division under the Consumer Protection Act seeking restitution, we next determine whether the Maryland Constitution nevertheless requires a jury trial. The Division argues that there is no right to a jury trial where the Legislature has committed to an administrative agency the initial decision making function for a particular class of disputes. We agree.

We have made clear that the General Assembly may assign initial factual determinations to an administrative agency, instead of a jury. In *Branch v. Indemnity Ins. Co.*, 156 Md. 482, 144 A. 696 (1929), we held that the jury right did not extend to an administrative process created by a workers' compensation statute that replaced common law causes of action. *Id.* at 487, 144 A. at 697. In *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), we made clear that *Branch's* holding applies generally, beyond the workers' compensation context. In *Murphy*, we held that a statutory cap on noneconomic tort damages did not violate the jury right, because the General Assembly removed the issue of damages exceeding the cap from the judicial arena. *Id.* at 373, 601 A.2d at 117. We relied upon *Branch*, stating as follows:

"Where, however, the General Assembly has provided that a matter shall not be resolved in a judicial proceeding, by legislatively abrogating or modifying a cause of action, no

---

and (b) of this subtitle or after an administrative hearing has been held under § 13–403(d)(3) and (4) of this subtitle." Section 13–410(d) lists factors for the Division to consider in the administrative proceedings to determine the amount of the civil penalty.

question concerning the right to a jury trial arises. Since, under such circumstances, the matter will not be resolved in a judicial proceeding, the question as to whether a judge or a jury shall resolve the matter simply does not arise." 325 Md. at 372, 601 A.2d at 116.

Although the issue of whether there exists a right to a jury trial in an administrative proceeding under the Consumer Protection Act is one of first impression before this Court, we considered a similar issue in *Maryland Aggregates v. State,* 337 Md. 658, 655 A.2d 886 (1995). Maryland Aggregates challenged Md.Code (1973, 1989 Repl.Vol., 1994 Cum.Supp.), §§ 7–6A–10.1 and 7–6A–10.2 of the Natural Resources Article, an act intended to protect landowners in a particular type of terrain from the effects of surface mine dewatering. *Id.* at 664, 655 A.2d at 889. Maryland Aggregates argued that because under the Act questions relating to compensation for property damage are resolved in the first instance by the Department of Natural Resources, the Act was invalid because it did not provide for a jury trial of those issues. *Id.* at 679–80, 655 A.2d at 897. We rejected the argument, holding that "the jury trial guarantee [is] inapplicable where the legislature has committed to an administrative agency the initial decision making function with respect to a particular class of disputes." *Id.* at 680, 655 A.2d at 897. Writing for the Court, Judge Eldridge explained as follows:

"As we have discussed, the statute vests in the Department of Natural Resources the primary power to resolve disputes relating to compensation. In *Murphy v. Edmonds, supra,* 325 Md. at 370–375, 601 A.2d at 116–118, this Court explained that the right under the Maryland Constitution to a civil jury trial concerns the allocation between judge and jury of the responsibility for decision making in judicial proceedings. Thus, as we emphasized (325 Md. at 372, 601 A.2d at 116),

'[w]here ... the General Assembly has provided that a matter shall not be resolved in a judicial proceeding, by legislatively abrogating or modifying a cause of action, no

question concerning the right to a jury trial arises. Since, under such circumstances, the matter will not be resolved in a judicial proceeding, the question as to whether a judge or a jury shall resolve the matter simply does not arise.' "

*Id.*

In this case, the General Assembly created the Consumer Protection Division and charged it with, among other things, initial power to adjudicate alleged violations of the Consumer Protection Act and to enforce the Act through remedies including restitution. *See* § 13–204(4). By doing so, the General Assembly has determined that Consumer Protection Act violations will be determined initially outside of judicial proceedings. We hold that Article 23 and Article 5 do not apply to administrative proceedings under the Act.

## 2. Due Process

■■■ Morgan next argues that he was denied due process of law under the Maryland Declaration of Rights and the Fourteenth Amendment to the United States Constitution because there is no separation of the prosecutorial and adjudicatory process within the Division. Morgan claims that the Division's combination of prosecutorial and adjudicatory functions makes the adjudicatory process farcical, as the Division's adjudicator can overturn the ALJ's proposed decision and issue an order in accord with the Division prosecutors' charges. Morgan's argument has no merit.

In *Consumer Publishing,* the Company raised the same issue Morgan raises, *i.e.,* that the Consumer Protection Division's combination of prosecutorial and adjudicatory functions violated his right to due process of law. *Id.* at 761, 501 A.2d at 64. We rejected that argument, holding that "the combination of functions in the Attorney General's office, in itself, is clearly not a violation of due process of law." *Id.* at 763, 501 A.2d at 65. We based our holding on *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), where the Supreme Court pointed out as follows:

"The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in an administrative adjudication ... must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

421 U.S. at 47, 95 S.Ct. at 1464. The Supreme Court rejected the "bald proposition" that "agency members who participate in an investigation are disqualified from adjudicating." *Id.* at 52, 95 S.Ct. at 1467. Finally, the Supreme Court stated:

"It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law."

*Id.* at 56, 95 S.Ct. at 1469.

In accordance with *Consumer Publishing* and *Larkin,* we hold that the Consumer Protection Division does not violate Maryland's or the Federal Constitution's Due Process provisions when it investigates, prosecutes, and adjudicates a case.

The Supreme Court, in *Larkin,* did leave open the possibility that a combination of administrative functions may create a due process violation. The Court stated:

"That the combination of investigative and adjudicative functions does not, without more, constitute a due process violation, does not ... preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high."

421 U.S. at 58, 95 S.Ct. at 1470. We addressed this possibility in *Consumer Publishing,* and we concluded as follows:

"In the present case, the actions of the Consumer Protection Division of the Attorney General's Office fall well within the range of acceptable combinations of functions set forth in *Withrow v. Larkin, supra.* The Division investigated Consumer Publishing's advertising practices, filed charges based on the results of the investigation and held hearings to determine whether the Company had violated the Consumer Protection Act. While the Attorney General clearly received the results of the investigation and approved the filing of charges, the record indicates that he did not participate in the adjudicatory process, either at the initial hearing or at the later hearing on exceptions. The hearing officer and the Chief of the Division, who did exercise adjudicatory functions, did not participate in the investigation. The combination of functions in the Attorney General's office, in itself, is clearly not a violation of due process of law."

304 Md. at 763, 501 A.2d at 64–65. We then reviewed three specific acts by the Division, such as issuing a press release, and concluded that they did not constitute due process violations. *Id.* at 763–70, 501 A.2d at 65–68.

In the case *sub judice,* there is no evidence in the record of special facts and circumstances posing an intolerably high risk of unfairness, nor is there any allegation of such evidence, other than the Division's general procedure for investigating, prosecuting, and adjudicating cases—the same procedure we upheld in *Consumer Publishing.* A party claiming that an agency's adjudicative process violated the party's due process right "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Larkin,* 421 U.S. at 47, 95 S.Ct. at 1464. Morgan has not met this burden.

## C. Sufficiency of the Evidence Against the Appraisers

The Division and Morgan each appeal two of the Circuit Court's holdings. The Division contests the Circuit Court's holding that the Division Chief could not find based only on the written record that Morgan and Almony had violated the Consumer Protection Act in their selection of comparable

sales and calculation of neighborhood predominant values. Morgan appeals the Circuit Court's affirmation of the Division's finding that he had violated the Act by not reporting prior sales. Morgan also appeals the Circuit Court's holding that the Division properly ordered him to pay civil penalties. The Division appeals the Circuit Court's dismissal of the Division's charges against Almony.

### 1. Propriety of the Division Chief's Paper-Based Findings

■ The Circuit Court reversed the Division Chief's findings that Almony and Morgan violated the Act because of misrepresentations as to comparable sales and neighborhood predominant values.[29] The court ruled that the Division Chief could not make the requisite findings based only on a paper record. The Circuit Court stated as follows:

"What happened on exceptions to this determination by the ALJ is that the Division Chief made that demeanor based credibility assessment and that he could not legally do. Only paper recitations were before him. What the Division could have done was to say it found the ALJ to be in error on the law, and remand the case for a credibility judgment on the testimony given. What it could not do, was what it did and that was to say on the basis of testimony appearing in the written record that one appraiser's testimony over another was found as a matter of fact. The Division's decision is reversed and a remand is ordered for a decision based on eyeball to eyeball testimony. Upon that testimony a demeanor based credibility decision may be made."

The Division argues that the Circuit Court erred in remanding the issues of whether the appraisers violated the Act in their selection of comparable sales and calculation of neighborhood predominant values. The Division maintains that its

---

**29.** The Circuit Court agreed with the Division that the ALJ erred in concluding that because comparable selection and neighborhood value calculation were inherently subjective determinations, they could not be the basis for an Act violation.

findings did not require a demeanor-based credibility assessment. Additionally, the Division argues that the Division Chief properly could determine that there was no direct conflict between the experts on the crucial issues and could resolve any differences based upon evidence in the record.[30]

■ This issue revolves around whether the Division's determination of misrepresentations in comparable sales and neighborhood predominant values was a demeanor-based credibility assessment. A fact finder makes a demeanor-based credibility assessment when he or she bases a finding or decision on such factors as " 'the expression of [the witness or party's] countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other nonverbal communication.' " *Anderson v. Dep't of Public Safety,* 330 Md. 187, 216, 623 A.2d 198, 212 (1993) (quoting *Penasquitos Vill., Inc. v. Nat'l Labor Relations Bd.,* 565 F.2d 1074, 1078–79 (9th Cir.1977)).

■ In some circumstances, the Division may make findings and issue an order in reliance on the written record, without the Division Chief personally observing the witnesses as they testify. In *Anderson,* an ALJ conducted a hearing and proposed that a terminated correctional officer be reinstated. 330 Md. at 204, 623 A.2d at 206. The agency designee reviewed the record, made findings of fact, and reversed the ALJ's decision.[31] *Id.* at 205–07, 623 A.2d at 206–08. This Court stated that an agency may reverse an ALJ's findings

---

**30.** Morgan and Almony argue that the Division Chief made his decision based on an incomplete record. When ruling on the exceptions, the Chief had access to all of the exhibits in the record and transcripts of the testimony of Robert Hinton, Michael Almony, John Morgan, Peter Vidi, and Robert Stagmer (Shpritz's employee). The transcripts available to the Chief contained all of the relevant testimony and documents for assessing the appraisals.

**31.** In *Anderson v. Dep't of Public Safety,* 330 Md. 187, 623 A.2d 198 (1993), the agency designee listened to a tape recording of the testimony that had been presented at the ALJ hearing. *Id.* at 205, 623 A.2d at 206–07.

and that the reviewing court must determine only whether the agency's final order meets the substantial evidence test. *Id.* at 215, 623 A.2d at 211 (relying on the Supreme Court's decisions for the parallel federal Administrative Protection Act in *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) and *Fed. Commun. Com'n v. Allentown Broad. Corp.*, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955)).

Case law addressing the federal Administrative Procedure Act supports the conclusion that an agency official may make findings and issue an order based on the written record alone. In *Morgan v. United States,* 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936), the Supreme Court considered a challenge to an order of the United States Secretary of Agriculture fixing the maximum rates for buying and selling livestock at stockyards. An agency examiner held a hearing and heard testimony, but the Secretary rendered the order without considering the testimony. The Supreme Court reversed the Secretary's order, rejecting the position "that one official may examine evidence, and another official who has not considered the evidence may make the findings and order." *Id.* at 481, 56 S.Ct. at 911. The Court stated, "The one who decides must hear." *Id.* at 481, 56 S.Ct. at 912. Immediately after this statement, however, the Court made clear that an agency official could make findings after reviewing the written record of the testimony. The Court stated as follows:

"This necessary rule does not preclude practicable administrative procedure in obtaining the aid of assistants in the department. Assistants may prosecute inquiries. Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates. Argument may be oral or written. The requirements are not technical. But there must be a hearing in a substantial sense. And to give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them. That duty undoubtedly may be an onerous one, but the performance of it in a substantial

manner is inseparable from the exercise of the important authority conferred."

*Id.* at 481–82, 56 S.Ct. at 912.

Federal courts have relied on *Morgan* for the principle that administrative officers may rely on the written record in making quasi-judicial decisions. This Court has noted that the "general rule in both the federal and state systems ... is that in the absence of specific statutory direction to the contrary the deciding member or members of an administrative or quasi-judicial agency need not hear the witnesses testify." *Younkin v. Boltz,* 241 Md. 339, 342, 216 A.2d 714, 715 (1966). We stated that in "the federal system neither the Supreme Court nor any lower court has ever required deciding officials to hear the witnesses testify." *Id.* at 343, 216 A.2d at 715–16. In *Guerrero v. State of New Jersey,* 643 F.2d 148 (1981) (per curiam), the United States Court of Appeals for the Third Circuit stated as follows:

"It has been settled since *Morgan v. United States* that in administrative adjudications, deciding officers need not actually hear the witnesses' testimony. Although the Court stated that 'the one who decides must actually hear,' it clarified its statement by indicating that it was permissible for a decision to be based solely on a considered review of the evidence and legal arguments. The Court held that '[e]vidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates.... [T]he officers who make the determination must consider and appraise the evidence which justifies them.'

"This court has adhered to the principle that administrative officers charged with a decision need not personally hear testimony but may instead rely on a written record."

*Id.* at 149 (citations omitted); *see also Estate of Varian v. Com'r of Internal Revenue,* 396 F.2d 753, 755 (9th Cir.1968) (per curiam) (holding that "[t]he Supreme Court's statement that '[t]he one who decides must hear,' ... means simply that the officer who makes the findings must have considered the evidence or argument"); *Utica Mut. Ins. Co. v. Vincent,* 375

F.2d 129, 132 (2d Cir.1967) (citing *Morgan* and stating that "[n]othing in this suggests that the decider must actually hear the witnesses or be furnished a report on their credibility; the thrust is quite the opposite"); *Southern Garment Mfrs. Ass'n v. Fleming*, 122 F.2d 622, 626 (D.C.Cir.1941) (explaining that "[w]hile 'the one who decides must hear,' it must be remembered that 'hear' is used in the artistic sense of requiring certain procedural minima to insure an informed judgment by the one who has the responsibility of making the final decision and order").

State courts similarly have held that an agency official may decide a case without hearing the witnesses testify. *See, e.g., Schmidt v. Beeson Plumbing and Heating*, 869 P.2d 1170, 1177 (Alaska 1994) (stating that "[t]hough due process requires that administrative officers 'hear' the evidence presented at a hearing, they need not physically attend the presentation of the evidence, and they may 'hear' the evidence by making an informed judgment on evidence received through a hearing officer"); *In re Fichner*, 144 N.J. 459, 677 A.2d 201, 207 (1996) (citing *Morgan* and noting that "the requirements of due process rarely require auditory perception of all the evidence by each board member who votes"). *See generally* E.H. Schopler, Annotation, *Administrative Decision by Officer Not Present When Evidence was Taken*, 18 A.L.R.2d 606, 607 (1951) (noting for federal and state courts that "[a]s a general proposition, due process or the concept of a fair hearing does not require that the evidence be taken before the officer who decides or participates in the decision").

▮ An exception exists when the agency decision depends necessarily upon a demeanor-based assessment. In such cases, it would be difficult for an agency designee to make findings without hearing the testimony. Thus, in *Anderson,* we held that evidence supporting the agency's decision " 'may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different' " than the agency's conclusions. 330 Md. at 216, 623 A.2d at 212 (quoting *Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 469). We stated that an agency

should give "appropriate deference" to the ALJ's demeanor-based findings, because the ALJ is in the unique position to make such judgments. *Anderson,* 330 Md. at 216, 623 A.2d at 212. Accordingly, we vacated the agency's judgment, because credibility was pivotal to the case, the agency gave no deference to the ALJ's assessment, and the agency provided no strong reasons for reversing the ALJ's assessment. *Id.* at 218–19, 623 A.2d at 213; *see also Gabaldoni v. Board of Physician,* 141 Md.App. 259, 263, 785 A.2d 771, 773 (2001) (upholding the agency's rejection of the ALJ's findings because, to the extent that the agency had disagreed with demeanor-based findings, the agency presented strong reasons for its position); *Department v. Shrieves,* 100 Md.App. 283, 296–301, 310–11, 641 A.2d 899, 906–08, 912–13 (1994) (applying *Anderson* and remanding because it was not clear from the agency's decision to what extent the agency had rejected the ALJ's demeanor-based findings); *Hameetman v. City of Chicago,* 776 F.2d 636, 644 (7th Cir.1985) (noting that "when there is conflicting oral testimony going to the heart of the question to be decided, so that an evaluation of the witnesses' demeanor may be critical to deciding the question correctly, an appellate tribunal ... will have a hard time making responsible findings of fact").

In the present case, the Division properly could determine based on the record whether Morgan and Almony had violated the Consumer Protection Act through their selection of comparable sales and calculation of neighborhood predominant values. The Division's evidence consisted primarily of reports prepared by its expert, Robert Hinton. Hinton reviewed Morgan and Almony's appraisals based on Hinton's consideration of data available at the time Morgan and Almony wrote their reports. Hinton testified before the ALJ and was subject to extensive cross-examination.

Morgan relied primarily on his expert, Peter Vidi, who disputed some of Hinton's testimony about the appraising process and the resources available to appraisers. Morgan testified that he understood FHA guidelines to require different criteria for selecting comparable sales than those that

Hinton described. He also generally denied any wrongdoing. Almony testified before the ALJ, and simply denied any wrongdoing. To show that appraisals vary, he presented a written appraisal of one of the properties he had appraised. This appraisal was prepared by Janice Ramsay, a respected appraiser.

A conclusion based on this evidence necessarily would focus on appraisal standards, the accuracy of Morgan and Almony's appraisals, and the information available to the appraisers at the time of the appraisal. As such, the determination would focus on the experts' testimony, Hinton's reports, Ramsay's reports, Morgan's testimony about his understanding of appraisal procedures, and, most importantly, Morgan and Almony's actual appraisal reports.

An assessment of the appraisers' demeanor is of minimal importance in this technical case. Ordinarily, demeanor has been held to be of little consequences in evaluating the credibility of experts who provide conflicting testimony. In *New England Coalition on Nuclear Pollution v. United States Nuclear Regulatory Comm'n,* 582 F.2d 87 (1st Cir.1978), the court held as follows:

> "Though credibility of the conflicting experts must play a central role in the [agency] decision, that credibility is a function of logical analysis, credentials, data base, and other factors readily discernible to one who reads the record. [The intervener] has not demonstrated that this is an issue that turns on conflicting eyewitness reports or evaluations of the witnesses' demeanor or conduct."

*Id.* at 100; *see also Citizens for Rewastico v. Comm'rs of Hebron,* 67 Md.App. 466, 482–83, 508 A.2d 493, 502 (1986) (citing *New England Coalition* and holding that "[f]or purposes of evaluating credibility, we divide the witnesses into two groups, experts and laymen, as the case law recognizes two different criteria in the evaluation"); *Millar v. Fed. Communications Comm'n,* 707 F.2d 1530, 1539 (D.C.Cir.1983) (listing conflicting expert testimony as a category in which "credibility may play a role, but demeanor may not" and citing

*New England Coalition* ); Note, *Replacing Finders of Fact—Judge, Juror, Administrative Hearing Officer,* 68 Colum. L.Rev. 1317, 1328 n. 52 (1968) (stating that reliance on an expert's demeanor to determine credibility is "dangerous").

Accordingly, we hold that the Circuit Court erred in reversing the Division on the grounds that the Division Chief could not make a decision based on the written record. Neither Almony nor Morgan have shown that the resolution of the issues turned on a demeanor-based credibility assessment of the experts. The Division Chief properly could determine based on this record alone whether Morgan and Almony violated the Consumer Protection Act in their selection of comparable sales and calculation of neighborhood predominant values.

## 2. Substantial Evidence as to Morgan

As discussed *supra,* the Circuit Court erroneously remanded consideration of the comparable sales and neighborhood predominant values. We now review whether the Division's findings of Consumer Protection Act violations based on the prior sales histories, comparable sales, and neighborhood predominant values were supported by substantial evidence.

### (a) Prior Sales

 Morgan appeals the Circuit Court's holding that the Division had substantial evidence to find him in violation of the statute for misrepresenting prior sales histories. The Division charged Morgan with failing to note in his appraisals when a property had been transferred within twelve months before the proposed sale. The *Uniform Standards of Professional Appraisal Practice* requires that appraisers list all prior sales that occurred within the year. *Advisory Opinion AO–1, supra.* The Uniform Residential Appraisal Report form asks for prior sales of the subject property and comparable properties. The ALJ found that in all thirty-two of the subject appraisals Morgan conducted, he reported that there had been no prior sale. In actuality, *thirty* of the properties had been sold within the previous twelve months.

Administrative Law Judge Spencer rejected Morgan's argument that the discrepancies were caused by a delay between the recording of the deed and the deed reporting service making the information available to appraisers. She based her finding that Morgan's argument was incredible on a number of facts: (1) Morgan listed Shpritz or one of his companies as the deed owner of record on the appraisals, evidence that he was aware of the prior sale transferring the property to Shpritz; (2) for at least five properties, the prior sale was at least seven months prior to the appraisal, ample time for it to be posted by the reporting service;[32] and (3) Morgan testified that he reported that there were "no transfers" at the suggestion of an American Skycorp employee, even when Morgan was aware of discrepancies between the owner listed on a property's deed and the seller listed on the sales contract. Finally, the ALJ rejected Morgan's argument that consumers did not rely on his appraisals because they did not review the appraisals themselves. She found that Morgan believed that the consumers would have access to his appraisals and that Morgan's failure to report the prior sales would tend to deceive a reviewer of the appraisals.

We hold that the Division had substantial evidence to find that Morgan had violated § 13–301(1) and (3) based on his failure to report the prior sales histories in his appraisals.

### (b) Comparable Sales

We first address Morgan's contention that selection of comparable sales is subjective to the extent that a fact finder cannot determine whether an appraiser misrepresented in the selection. A review of the record indicates that the Consumer Protection Division may find an appraiser to have violated the Consumer Protection Act through his or her selection of comparable sales. Simply because the selection of comparable properties may be a subjective determination does not mean a

---

32. Hinton testified that there typically is a ninety day delay between execution of the deed and its posting by the deed reporting service. Vidi testified that the State Tax Assessment Office data on deeds could have up to a five month delay before release.

factual representation using comparables as a measure of value cannot be a misrepresentation. Not all comparables are appropriate. Even if the ALJ accepted the testimony of Morgan's expert that there is a range of acceptable valuations for appraisals, and that the generally accepted range between appraisals is five to ten percent, a fact finder could view comparables leading to a valuation outside the range as an indication of misrepresentation, with the likelihood of misrepresentation increasing as the deviation from the range increases.[33]

██ We conclude that the Division's finding that Morgan violated § 13–301(1) and (3) through his misrepresentation of comparable sales was supported by substantial evidence. The Division's case relied primarily on Robert Hinton, the Division's expert. Hinton's review of each appraisal was based on the appropriate data bases and records as they existed at the

---

**33.** Additionally, the FHA endorsement process makes clear the feasibility of reviewing the selection of properties used as comparable sales. HUD requires that an FHA reviewer examine every appraisal to determine accuracy, consistency, soundness, and efficiency. No. 4150.1 at 9–1. Reviewers are instructed to evaluate the selection of comparable sales to determine whether the selections are reasonable. Criteria for ascertaining reasonableness include the distance between the comparables and the subject property, the recency of the comparable sales, and differences between the properties in size, age, and design. *Id.* at 9–2. HUD also requires that HUD field offices conduct a certain percentage of field reviews of appraisers' reports. These reviews aim at measuring the quality of the appraisers' performance and assuring that the appraisers have "followed accepted appraisal techniques and arrived at a logical conclusion." *Id.* at 9–3. While HUD recognizes that adjustments for differences in comparables, based on factors such as location, are "judgmental factors," HUD instructs reviewers to comment when such adjustments "do not appear appropriate." *Id.* HUD's rating system for field reviews is premised on the feasibility of evaluating appraisers' use of the comparable sale approach. For example, a reviewer should rate an appraisal as a one or two out of five when the appraisal contains errors or omissions which result in value determinations posing an unacceptable risk to HUD. *Id.* at 9–7. After three ratings of one or two, HUD's Chief Appraiser must sanction the appraiser. *Id.* We are convinced that just as the FHA evaluates appraisers' reports, so too the Consumer Protection Division may determine that an appraiser's selection of comparable sales constituted a misrepresentation.

time of the initial appraisal. He concluded that Morgan made inaccurate statements of comparable sales in twenty-eight of the thirty-two appraisals. Hinton indicated that Morgan regularly chose comparable sales relatively far from the subject property, when much closer comparable sales were available. In many instances, Morgan ignored comparable sales on the same street—including, in some instances, the house next door to the subject house. While Morgan's comparable sales were not far away, often within a half mile of the subject properties, they were far enough away to cause significant discrepancies. As Hinton testified, the value of properties in the Bel Air/Edison area depends upon location, and properties on one block can be worth significantly more or less than properties on the next block. By selecting comparable sales further away from the subject property, Morgan presented an inaccurate and grossly inflated valuation of the subject property.

Morgan's explanation that he chose comparables based on bedroom count, bathroom count, square footage, and age, rather than location, is belied by a review of his appraisals. In a number of transactions, Morgan used dissimilar properties as comparable sales and ignored properties that were similar and closer to the subject property. Morgan's willingness to select dissimilar properties to use as comparables is evidenced most dramatically by his selection of a property containing a one-story addition used as a Knights of Columbus Hall with a bar and kitchen area. He listed that property as a comparable in three appraisals of ordinary rowhouses.

A close look at his appraisals illustrates Morgan's selection of comparables that violated his selection criteria. For example, in his appraisal of 2826 Pelham Avenue, Morgan selected three comparables located respectively one-quarter, one-half, and one-half miles away from the subject property. Hinton identified three comparable sales on the same street as the subject property. Hinton's comparables had the identical number of bedrooms and bathrooms as the subject property, were almost identical sizes, and were the same age. Morgan's first comparable had a modern kitchen and central air conditioning, amenities the subject property did not have. Mor-

gan's second comparable sale was a significantly larger house than the subject property. Hinton noted that the house had an extra half story, was a corner house, had a park view, and was over 1,000 square feet larger than Morgan indicated. Even Morgan noted that the comparable had an additional bedroom and "0.1" more bathrooms. Morgan's third comparable had sold nine months before for only $29,000, but Morgan did not note this sale and valued the property at $78,700. Finally, Morgan viewed his comparables to be sufficiently different from the subject property that they required a large number of adjustments.

■ Morgan argues that Hinton's testimony was based on comparable sales data over six months old and that Morgan adhered to FHA guidelines recommending use of sales data less than six months old.[34] The Division found Morgan's argument meritless because in his appraisals, Morgan frequently used comparable sales older than six months; out of thirty-two appraisals, Morgan chose twenty-five comparable sales older than six months.

■ Morgan's argument that some of the comparable sales Hinton used in reviewing the appraisals might not have been

---

**34.** There is some basis for Morgan's argument, as the FHA guidelines state as follows:

"The comparable sales data should not be over six months old. Anything over six months may reflect a different market. If a comparable is seven or eight months old, the reviewer should expect an explanation for its use and possibly an adjustment relating to any upward or downward trend in the marketplace, if appropriate. Any comparable a year or more old is unacceptable, except in those rare cases where there are no comparables within a reasonable distance which were recent sales. This may occur in certain rural areas."

No. 4150.1 at 9–2. Similarly, U.S. Dep't of Hous. and Urban Dev., No. 4150.2, *Valuation Analysis for Single Family One- to Four-Unit Dwellings* (1999), released after many of the transactions in this case occurred, instructs appraisers as follows:

"Consider the amount of time that has elapsed between the sale date and the effective date of the appraisal. Sales data should not exceed six months between the date of the appraisal and the sale date of the comparable, and must not exceed twelve months. An explanation is required for sales dates in excess of six months."

*Id.* at 4–6.

available to Morgan when he conducted his appraisal is not supported by the record. First, Morgan argues that because of delays between the sale of a property and its listing in MRIS or the deed services, the sales were not available to him. This assertion is belied by Hinton's testimony that the entry dates on MRIS show that the prior sales *were* available to Morgan. Morgan also argues, supported by Vidi, that MRIS is composed of a number of servers, that it takes five to six hours for information inputted into one server to be transferred into the others, and, consequently, that Morgan might not have had access to information inputted into one MRIS server. This argument is unavailing, as Hinton only criticized Morgan for ignoring information inputted into MRIS days, not merely hours, before Morgan's review. Moreover, Morgan does not point to any specific instance in which a comparable sale used by Hinton was not available to him. Instead, Morgan makes a general argument that the data bases might not have posted the sales of the comparable properties in time for him to view them. Without pointing to any particular instance, Morgan has not provided any evidence to explain his failure to consider far superior comparable sales than the ones he selected.

Finally, Morgan argues that he could not have misrepresented the value of the property through the comparable sales, because he did not always appraise the property at the Shpritz parties' designated sale price. Morgan points to ten properties he appraised as worth less than the sale prices and notes that under FHA guidelines, an appraisal under the purchase price provides the purchaser an opportunity to cancel or renegotiate the sale price. *See* HUD–91322.3. Although under-appraisals might indicate that Morgan did not rubber stamp the Shpritz parties' sale price, the mere fact that Morgan appraised some properties for less than the Shpritz parties' artificially inflated prices does not *ipso facto* absolve Morgan. That an appraisal may be inflated even more is not a defense to an artificially inflated appraisal. We reject Morgan's argument.

Accordingly, we hold that substantial evidence existed in the record to support the Division's finding that Morgan had violated the Consumer Protection Act through his selection of comparable sales.

### (c) Neighborhood Predominant Values

██ We hold that the Division lacked substantial evidence to find that Morgan had misrepresented neighborhood predominant values. The Division alleged that Morgan misrepresented the neighborhood predominant value in fourteen appraisals. Hinton presented only general testimony about the calculation of neighborhood predominant values. He did not produce any evidence showing how he arrived at his values for any of the properties. On cross-examination, he acknowledged that he had not brought any documents to the hearing to show how he arrived at his values. Similarly, his reports merely state his conclusion of the appropriate neighborhood predominant value. In sum, for each property, the Division's evidence consisted entirely of two numbers. One number was Morgan's calculation of the neighborhood predominant value. The other was Hinton's calculation, a smaller number. The Division's conclusion that Morgan's calculations constitute misrepresentations is not supported by substantial evidence.

### 3. Substantial Evidence Bearing on Morgan's Civil Penalty

██ Morgan appeals the Division's imposition of $34,000 in civil fines. Section § 13–410 authorizes the Division to recover up to $1,000 in fines per violation from a first time violator of the Consumer Protection Act. The Division concedes that the fines should be reduced to $32,000, because the case only involves thirty-two of Morgan's appraisals. It defends the remaining $32,000 as an appropriate fine based on the factors that § 13–410(d) mandates that the Division consider.

Section 13–410(d) provides as follows:

"*Factors affecting penalty amount.*—The Consumer Protection Division shall consider the following in setting the

amount of the penalty imposed in an administrative proceeding:

(1) The severity of the violation for which the penalty is assessed;

(2) The good faith of the violator;

(3) Any history of prior violations;

(4) Whether the amount of the penalty will achieve the desired deterrent purpose; and

(5) Whether the issuance of a cease and desist order, including restitution, is insufficient for the protection of consumers."

The Division considered the statutory factors and concluded that: (1) the violations were severe because Morgan exploited a vulnerable group of consumers and hurt communities by increasing defaults and foreclosures; (2) Morgan lacked good faith, as he intentionally misled consumers; (3) he was a first time violator; (4) high penalties were necessary for deterrence, because Morgan was motivated by financial gain; and (5) restitution would not be sufficient to protect consumers.

We apply the substantial evidence test, as the Division's application of the statute's factors to the facts is a mixed question of law and fact. *See Vann,* 382 Md. at 296, 855 A.2d at 319. The Circuit Court affirmed the Division's Order. Substantial evidence existed to support the Division's decision to impose the full $1,000 per violation.

### 4. Substantial Evidence as to Almony

The Circuit Court reversed the Division's conclusions that Almony violated the Act and dismissed the charges against him. The court found that the Division was clearly erroneous in making a different judgment than that of the ALJ, who had dismissed the charges against Almony. The Circuit Court concluded that the evidence was not sufficient to "determine that Almony violated the Act, as no pattern of deceit, as opposed to mistake or difference of opinion on his part is shown." The court ruled as follows:

"On the basis of the information presented in this case before the ALJ, it was clearly erroneous for the Division to pick misrepresentation over negligence. The ALJ found no basis to say a misrepresentation occurred and she observed and ruled as a matter of demeanor based credibility. The Division was clearly erroneous in making a different judgment."

The Division appeals. The Division makes several arguments. The Division argues that § 13–301(1) and (3) do not contain a scienter requirement and that the statute can be violated by the making of a false or deceptive statement that has the capacity to mislead the consumer. The Division also argues that the ALJ's proposed findings as to Almony were not demeanor-based and that the Division could properly overrule the ALJ's proposed findings and conclusions.

Before this Court, Almony, as might be expected, asserts that the Circuit Court was correct. Almony argues that the ALJ's decision was demeanor-based, and, as such, the Division must give the ALJ's finding great deference.

 The Circuit Court erred in holding that there is a scienter requirement for § 13–301(1) and (3). We decided this issue in *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328 (1986), noting as follows:

"Furthermore, none of the applicable CPA [Consumer Protection Act] sections requires the landlord to have knowledge of the falsity or intent to deceive. Section 13–301(1) requires only a '[f]alse, falsely disparaging or misleading statement' . . . § 13–301(3) prohibits a 'failure to state a material fact.' *Cf.* § 13–301(9) (which requires '[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment . . . with the intent that a consumer rely on the same . . .'). In other words, § 13–301(1), (2), and (3) does not require scienter on the part of the landlord; the subsections require only a false or deceptive statement that has the capacity to mislead the consumer tenant."

*Id.* at 10–11, 517 A.2d at 332–333; *cited with approval in Luskin's v. Consumer Protection*, 353 Md. 335, 367, 726 A.2d

702, 718 (1999). The Circuit Court also erred in concluding that the ALJ ruled based on demeanor-based credibility assessments, and that, therefore, the Division could not overrule her proposed findings. Almony's testimony did not address the substance of the allegations; he simply denied violating the Act. The ALJ's rulings were based on documentary evidence and the testimony of the Division's expert, Mr. Hinton. There is no basis for concluding that the ALJ ruled based on demeanor.

■ The Division concluded that Almony violated the Act with respect to two appraisals—the appraisal for 4106 Harris Avenue and 4230 Seidel Avenue. As to 4106 Harris Avenue, the Division found that Almony misrepresented that property's prior sale history. As to both properties, the Division concluded that Almony violated the Act based on his selection of the comparable sales he used in the appraisal report.[35]

■ Even were we to agree with Almony with respect to his failure to list or flag the prior sale of 4106 Harris Avenue, the Division presented substantial evidence as to the violation of the Act through inappropriate use of comparable sales. Based on Hinton's testimony, the Division found significant problems in Almony's selection of comparable sales for 4106 Harris Avenue.[36] Two of Almony's comparables were a half-mile and one was one-third of a mile away from the subject property. While the distances were within the required one

---

**35.** The Division also found that Almony misrepresented the neighborhood predominant values for the two properties. The Division lacked substantial evidence to support this conclusion, because the Division did not present any specific evidence showing the inappropriateness of Almony's calculations.

**36.** Janice Ramsay's appraisal of 4230 Seidel Avenue, requested by Almony, supports the Division's allegations that Almony selected unsuitable comparables. All three of Ramsay's comparables were on the same block as the subject property, and two of her selections were the same comparables as Hinton selected. Ramsay's comparables were all nearly identical to the subject property. As opposed to Almony's comparables, none of Ramsay's comparables had been sold previously within the prior year. Ramsay appraised the subject property at $60,000.

mile range, the properties were in a different sub-neighborhood composed of newer houses. While the subject property was a pre-World War II flat-roofed townhouse, Almony's comparables were post-World War II gable-roofed townhouses built twenty years after the subject property. According to Hinton, all three of the comparable sales were in "superior" condition, while Almony described them as "average." The subject property was in "average" condition. One of Almony's comparables, located on Parkside Drive, had a view of Herring Run Park. The subject property did not overlook a park. Almony failed to consider that the sale of the property with a park view might not be indicative of the subject property's value. Almony's comparable sales had adjusted sales prices between $66,500 and $71,100, resulting in an appraisal of $67,000 for the 4106 Harris Avenue. This appraisal fit with the $68,700 sales price.

Hinton located five comparable sales ranging from one block to one-quarter of a mile away from the subject property. With the exception of one property, all were built at approximately the same time as the subject property. All except for one had the same number of rooms and bathrooms. The comparables all were the same condition as the subject property, and none had park views. Hinton's comparable sales ranged in adjusted sales price from $35,300 to $45,700, resulting in a $40,000 appraisal. Hinton's appraisal is consistent with the previous listing of the property at $44,900 and Shpritz's purchase of the property for $33,100 less than three months before. The difference between Almony and Hinton's appraisals is $28,700.

Almony also selected inappropriate comparable sales for 4230 Seidel Avenue. Almony's first comparable was a block away from the subject property, but it was another property flipped by Shpritz. Almony should have been alerted to the unreliability of using this property as a reference point, because he noted a prior sale of this property. The resale price of the property was 175% of the prior sale price. Almony's

second comparable was two blocks away from the subject property. According to Hinton, however, this property was not comparable because it had been renovated from roof to basement. The subject property had not been renovated.[37] Almony's third comparable sale was six blocks away. Almony's selection of this property is problematic for a number of reasons. First, despite the close proximity to the subject property, this property was located outside the neighborhood boundaries Almony had noted. Second, Almony inflated the size of the property by 36.7%. Third, Almony noted a recent prior sale of the property. The property was resold for 256% of its prior price, which should have raised doubts about the sale's utility for assessing the subject property's value. Finally, Almony noted that the comparable's purchaser received $4,458 in financing concessions, but Almony did not consider that the concessions would have increased the sales price.

Hinton's appraisal reveals that Almony neglected to select four comparable sales on the same block as the 4230 Seidel Avenue property. These properties were near identical in size, bedroom and bathroom count, view, and condition. There were no prior sales to raise questions about using these properties as comparables. Hinton discounted one of these properties, because it was not an FHA-financed home and was apparently under market value. The remainder had adjusted sales prices ranging from $54,101 to $56,000, resulting in an appraisal of $54,500. In comparison, Almony's comparable sales had adjusted sales prices ranging from $76,200 to $78,280, resulting in a $77,500 appraisal. The Shpritz parties sold the property for $75,500.

We hold that the Division could find by substantial evidence that Almony had violated § 13–301(1) and (3) through his misuse of comparable sales in appraising 4106 Harris Avenue and 4230 Seidel Avenue.

---

**37.** In his appraisal, Almony described the subject property and the first two comparables as rehabilitated properties.

## V.

## Conclusion

**Consumer Testimony**

We reverse the Circuit Court's holding and direct that the case be remanded to the Division. We hold that the Division must present evidence of reliance before awarding restitution to any of the consumers who did not testify before the ALJ.

**Shpritz's Expenses**

We affirm the Circuit Court's judgment that in calculating restitution the Division must deduct Shpritz's investments to repair and refurbish the properties in preparation for resale and his illegal payments to the consumers.

**Joint and Several Liability**

We reverse the Circuit Court's holding. We hold that the Division properly could hold Shpritz and his companies and Almony and his companies respectively jointly and severally liable for restitution. The Division properly could hold Shpritz, L & R Properties, Inc., West Star Properties, Inc., Woody, American Skycorp, Inc., and Morgan jointly and severally liable for restitution. The Division improperly held Almony jointly and severally liable with the other parties for restitution.

**Right to a Jury Trial**

We affirm the Circuit Court's holding that Morgan had no right to a jury trial in this Consumer Protection Act enforcement action under the Maryland Declaration of Rights and the United States Constitution.

**Due Process**

We affirm the Circuit Court's holding that the Consumer Protection Division's combination of prosecutorial and adjudicatory functions did not violate Morgan's right to due process under the Maryland Declaration of Rights and the United States Constitution.

### Propriety of the Division Chief's Paper–Based Findings

We reverse the Circuit Court's holding. The Division properly could determine based on the record whether Morgan and Almony had violated the Consumer Protection Act through their selection of comparable sales and calculation of neighborhood predominant values.

### Substantial Evidence for Morgan

We reverse the Circuit Court's holdings. There was substantial evidence to support the Division's findings that Morgan violated § 13–301(1) and (3) of the Consumer Protection Act through misrepresenting prior sale histories and comparable sales. The Division's findings that Morgan violated the Consumer Protection Act in his calculation of neighborhood predominant values were not supported by substantial evidence.

### Substantial Evidence for Morgan's Civil Penalty

We affirm the Circuit Court's holding that the Division's decision to fine Morgan $1,000 per transaction was supported by substantial evidence.

### Substantial Evidence for Almony

We reverse the Circuit Court's holdings. There was substantial evidence to support the Division's findings that Almony violated § 13–301(1) and (3) of the Consumer Protection Act through misrepresenting comparable sales.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THIS ACTION TO THE CONSUMER PROTECTION DIVISION WITH DIRECTIONS TO VACATE ITS ORDER OF OCTOBER 22, 2002 IN PART AND TO ENTER A NEW ORDER CONSISTENT WITH THIS OPINION. COSTS TO BE PAID FORTY PERCENT BY MORGAN, FORTY PERCENT BY SHPRITZ, TEN PERCENT BY ALMONY, AND TEN PERCENT BY THE CONSUMER PROTECTION DIVISION.*